IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| MARATHON TARGETS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 25-121 |
| | ) | |
| v. | ) | Filed: March 13, 2025 |
| | ) | |
| THE UNITED STATES, | ) | Re-issued: March 24, 2025* |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MVP ROBOTICS, INC., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

## OPINION AND ORDER

Plaintiff Marathon Targets, Inc. ("Plaintiff") asks that the Court preliminarily enjoin (1) the performance of a single-award, fixed-price Indefinite Delivery/Indefinite Quantity ("IDIQ") contract awarded by the United States Marine Corps ("Marine Corps" or "Corps") for Trackless Mobile Infantry Targets ("TMITs") and associated services to Defendant-Intervenor MVP Robotics, Inc. ("MVP"), and (2) the Marine Corps' post-award decision to disqualify Plaintiff from competing for the same award. Plaintiff has failed to show a likelihood of success on its claims that the Marine Corps improperly disqualified it from this procurement, meaning that Plaintiff has failed to show that it likely has standing to pursue its remaining claims. Further, although Plaintiff

---

* The Court issued this opinion under seal on March 13, 2025, and directed the parties to file any proposed redactions by March 20, 2025. The opinion issued today incorporates the redactions proposed by Plaintiff, the Government, and Defendant-Intervenor MVP. Upon review, the Court finds that the material identified warrants protection from public disclosure, as provided in the applicable Protective Order (ECF No. 15). Redacted material is represented by bracketed ellipses "[. . .]."

has shown some irreparable harm, it has failed to show that the balance of harms tips in its favor. In the same vein, it has failed to demonstrate that preliminary injunctive relief is in the public interest. Accordingly, Plaintiff's Motion for Preliminary Injunction is **DENIED**.

# I.     BACKGROUND

## A.     The Solicitation and Award

On February 21, 2024, the Marine Corps issued Solicitation No. M6785424R8000 ("the Solicitation") seeking proposals from small-business contractors for an IDIQ contract for services related to TMIT system operations and pre- and post-training support. App. to Def.'s Resp. to Pl.'s Mot. for Prelim. Inj. ("App.") at 292, 333, ECF No. 32-2.[1] TMITs are robots that provide "a dynamic and realistic representation of human targets for use in live-fire / non-live fire training to increase lethality and unit readiness." App. 503. The Marine Corps received by the April 8, 2024 closing date three proposals in response to the Solicitation, including from Plaintiff and MVP. App. 36. On November 27, 2024, the Corps awarded the TMIT contract to MVP. App. 34, 36, 278.

The Corps' award decision was based on a three-factor evaluation of proposals including: (1) Technical Approach; (2) Past Performance; and (3) Price. App. 388. The Corps' Technical Evaluation Team ("TET") rated Plaintiff "Acceptable"[2] under the Technical factor, assigning three strengths and four weaknesses to Plaintiff's technical approach. App. 272–73, 390. The Corps'

---

[1] For ease of reference, citations to the Government's Appendix refer to the bates-labeled page numbers rather than the ECF page numbers.

[2] The Solicitation's evaluation criteria directed the Corps to assign one of the following adjectival ratings for Technical Approach: Outstanding, Good, Acceptable, Marginal, or Unacceptable. App. 390.

Past Performance Evaluation Team ("PPET") gave Plaintiff a "Satisfactory Confidence"[3] rating for its past performance on government contracts.  App. 273.  As to price, Plaintiff offered $[. . .], well below the contract ceiling of $[. . .].  App. 274.

The TET gave MVP a higher "Good" rating for MVP's technical approach.  The TET identified eight strengths in MVP's technical proposal, which "in many areas exceed[ed]" the project's "requirements in ways that are advantageous to the Government."  *Id.*  The PPET gave MVP a lower "Neutral" rating for its past performance, due in large part to MVP's lack of extensive relevant procurement history.  App. 274–75.  MVP's proposed price of $190,705,603.02 exceeded Plaintiff's by roughly $[. . .] million but fell roughly 16 percent below the Government's approved contract ceiling.  App. 275.

The Source Selection Authority ("SSA") concurred with each team's evaluation of proposals.  App. 276.  The SSA concluded that, under a best-value assessment, MVP provided "distinct advantages over" Plaintiff in the Technical factor and "lack[ed] the additional risks identified in [Plaintiff's] proposal."  *Id.*  The SSA determined that neither Plaintiff nor MVP distinguished itself on the Past Performance factor.  *Id.*  For Price, the SSA found that Plaintiff "appear[ed] to have a significant price advantage over MVP" but that Plaintiff's proposal contained certain "unbalanced pricing" terms—*i.e.*, terms that the Corps viewed as unrealistically low—that could create risk that Plaintiff would not be able to perform its contractual obligations.  App. 277.  Thus, while MVP's price was higher than Plaintiff's, its "balanced pricing across the proposal" made MVP's proposal "less risky" and "worth paying the price premium."  *Id.*  The SSA weighed the three factors and determined MVP to be the best value offeror.  App. 278.

---

[3] Under Past Performance, the Corps assigned each proposal a confidence assessment rating of either Substantial, Satisfactory, Neutral, Limited, or No Confidence.  App. 393.

**B.** **The Corps' Inadvertent Disclosure of MVP's Technical Evaluation to Plaintiff**

On November 27, 2024, the Corps' contracting officer ("CO") emailed Plaintiff's president, Dr. Alex Brooks, to notify him that Plaintiff did not win the TMIT contract.  App. 35. Attached to the CO's email was a letter titled "Unsuccessful Offeror Notification and Post-Award Debriefing, M6785425D8000," which itself included two attachments consisting of redacted versions of the TET's evaluation report and the SSA's Source Selection Decision.  App. 36.  The letter indicated that Plaintiff could submit up to five follow-up debriefing questions.  App. 37.

On December 2, 2024, Plaintiff submitted a small business size protest to the Marine Corps, arguing that MVP was not eligible for the award because it was subject to outside investor control and because it would primarily rely on a subcontractor that did not qualify as a small business. App. 72–81.  It also submitted 15 debriefing questions, which likewise named MVP's subcontractor.  App. 58.  The identity of MVP's subcontractor was, at the time, not officially announced.  On the same day, Plaintiff filed an agency-level protest with the Corps, alleging that the agency improperly limited Plaintiff to five follow-up questions in its post-award debrief.  App. 60.  The CO forwarded Plaintiff's size protest to the Small Business Administration ("SBA") on December 3, 2024.  App. 168.  At some point thereafter, the CO apparently realized that she inadvertently attached MVP's TET evaluation, which included references to its proposed subcontractor, to her email notifying Plaintiff of the award.  App. 48, 83 ("Upon receipt of your agency-level protest, the Agency discovered that it had inadvertently released source selection and proprietary information . . . .").

The CO emailed Dr. Brooks later on December 3 to notify him that she inadvertently included MVP's technical evaluation in the attachments to her November 27 email, which disclosed "source selection and proprietary information that is protected under FAR 2.101 and

3.104, as well as the Procurement Integrity Act, 41 U.S.C. 2102." App. 83. She asked Dr. Brooks to verify that he and any other individuals who received the document had deleted it. *Id.* She further advised that the Corps would investigate whether the "inadvertent disclosure of MVP's protected information to Marathon may give Marathon an unfair competitive advantage." *Id.* Dr. Brooks responded the following day, listing 11 individuals who received the document and committing that everyone would delete it.[4] App. 86. Notwithstanding that commitment, Dr. Brooks commented that the CO's mitigation requests were merely "cosmetic fix[es]" that could not "'unring' the bell" because "Marathon and its attorney ha[d] already closely scrutinized MVP's strengths" and "ensconced [those strengths] in a preliminary draft of a protest that Marathon [was] preparing to file at the U.S. Court of Federal Claims." App. 85. In other words, Dr. Brooks suggested that although he and his team would delete the confidential document, they would continue to retain derivative documents including the protected information and to use the protected information as a basis for a bid protest in this Court. Dr. Brooks suggested that the Corps disclose Plaintiff's strengths to MVP as an "equitable solution" to the inadvertent disclosure. *Id.*

The CO responded to Dr. Brooks' email the next day and notified him that she raised Plaintiff's review and use of the protected information with Marine Corps counsel as "a potential ethical violation." App. 163. Dr. Brooks responded, recommending "that we have our attorneys enter into a dialog" so Plaintiff and the Corps could "come to an accommodation on how the eight strengths of MVP can be asserted in a Court of Federal Claims protest." App. 170.

---

[4] Dr. Brooks confirmed to the CO on December 6 that all involved individuals had deleted the document at issue. App. 176.

### C.    Communications Between Plaintiff's Counsel and the Marine Corps

On December 7, 2024, Plaintiff's counsel, Jerome Gabig, emailed the Assistant Director of the Commercial Litigation Branch of the United States Department of Justice, advising that he was "preparing to file a [Court of Federal Claims] protest," App. 186, regarding the award to MVP and offering to "file the complaint without addressing" MVP's strengths, App. 188.   Agency counsel for the Marine Corps emailed Mr. Gabig on December 9, relaying further remediation requests that MVP had made.  App. 179–80.  The two apparently discussed the matter further over the phone on December 10.  App. 190.

The next day, Mr. Gabig sent a memorandum to the Corps' counsel asserting that source selection information is generally no longer protected after an agency awards a contract.  App. 191.  Additionally, he offered three "Pragmatic Steps for a Path Going Forward," proposing that the Corps (1) disclose the strengths of Plaintiff's bid to MVP and (2) allow the SBA size protest to proceed, and (3) that Plaintiff file a protest in this Court without raising MVP's strengths until it obtained access to the administrative record.   App. 194–95.   Mr. Gabig sent another memorandum on December 17, this time to the CO, which included a declaration from Dr. Brooks. App. 203.  In the declaration, Dr. Brooks asserted that Plaintiff had not misappropriated MVP's trade secret by identifying MVP's subcontractor in its SBA size protest because Plaintiff "had independent knowledge" of the identity of the subcontractor.  App. 206.  Dr. Brooks based this representation on an MVP press release dated November 27, 2024, identifying the subcontractor, as well as information Dr. Brooks received from Marathon employees who spoke with the subcontractor's employees.  App. 206–07.

Mr. Gabig again sent a memorandum to the Corps' counsel on December 20.  App. 216. He attached Plaintiff's draft bid protest complaint and referred the Corps to Christopher

Lockwood, who had newly been hired as lead counsel for Plaintiff and who Mr. Gabig noted had not "taint[ed] himself" by reading MVP's technical evaluation or the draft complaint.  App. 219. Mr. Gabig apparently received no response to either the December 11 or the December 20 memoranda.  Gabig Decl. ¶¶ 18–19, ECF No. 27-1.  On January 15, 2025, Mr. Lockwood emailed the Corps' counsel and the Department of Justice, notifying them that he intended to review and file Plaintiff's draft complaint in this Court "but wanted to consider any position [they had] on the subject" before he did so.  Pl.'s Ex. at 1, ECF No. 25-16.

### D.    The Marine Corps' Disqualification of Plaintiff and the SBA's Dismissal of Plaintiff's Size Protest

Meanwhile, the Marine Corps was investigating whether the Corps' disclosure and Plaintiff's retention of confidential source-selection information violated the Procurement Integrity Act ("PIA").  Given that the CO was directly involved in the underlying events, the Marine Corps assigned an independent contracting officer to conduct the investigation.  App. 33. On January 16, 2025, the independent investigator finalized his report.  *See* App. 1–31.  Although he found there to be no PIA violation, he recommended disqualifying Plaintiff from potential award under the Solicitation because of an organizational conflict of interest ("OCI"), the appearance of impropriety that Plaintiff created in its communications with the Corps, and Plaintiff's failure to act in accordance with its responsibility to demonstrate strong business ethics. App. 15–16, 31.  On the same day, the Director of Contracts and Chief of the Contracting Office for the Marine Corps System Command accepted the investigator's recommendations and disqualified Plaintiff from consideration for award due to its OCI and unfair competitive advantage that cannot be avoided or mitigated, and also its appearance of impropriety in violation of relevant

FAR provisions.  App. 32.  She further determined that Plaintiff was "not a responsible contractor and is unqualified and ineligible because it does not meet the standard in [FAR] 9.104-1(g))."  *Id.*

Shortly before finalizing these decisions, the Corps contacted Dr. Brooks one last time.  At 8:00 a.m. Eastern Time on January 16, 2025, the CO emailed Dr. Brooks, notifying him that "[p]ursuant to FAR 3.101 and 9.5, the Agency believes that Marathon has an appearance of impropriety and a conflict of interest based on the unfair competitive advantage it received from the agency's inadvertent disclosure of MVP's protected proprietary and source selection" information.  App. 270.  The CO gave Dr. Brooks until noon that day to respond if he believed the "appearance of impropriety and conflict of interest can be avoided or mitigated."  *Id.*  The CO acknowledged that this was "a short turnaround time but believe[d] it provide[d] a reasonable opportunity to respond, as the Government first raised this issue with Marathon on 3 December 2024 and has consistently raised its concerns since then."  *Id.*  Plaintiff failed to respond within that time.  Without any response, the investigating officer signed his report at 12:56 p.m.  App. 31.  At about 1:00 p.m. that same day, the Corps formally disqualified Plaintiff from award under the Solicitation.  App. 32.  In light of that decision, the SBA informed Marathon on January 17, 2025, that its size protest was dismissed for lack of standing.  Pl.'s Ex. at 1, ECF No. 25-21; *see also* App. 291 (memorandum for the record from the CO finding Plaintiff lacked standing).

Marathon filed its Complaint and Motion for Preliminary Injunction in this Court on January 21, 2025.  *See* Pl.'s Compl., ECF No. 1; Pl.'s Mot. for Prelim. Inj., ECF No. 5.  The Motion is ready for review.

8

## II.  DISCUSSION

### A.    Standard of Review

In a bid protest, this Court may issue a preliminary injunction pursuant to 28 U.S.C. § 1491(b)(2) and Rule 65 of the Rules of the United States Court of Federal Claims ("RCFC").  A preliminary injunction, however, is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Insulet Corp. v. EOFlow, Co.*, 104 F.4th 873, 879 (Fed. Cir. 2024) (internal quotation marks omitted) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  To obtain preliminary relief, the movant has the burden of demonstrating that: (1) there is a reasonable likelihood of success on the merits of its claim(s) at trial; (2) it will suffer irreparable injury if the injunction is not granted; (3) the harm suffered by the movant, if the injunction is not granted, will outweigh the harm suffered by the Government and any third-parties; and (4) granting the injunction is in the public interest.  *See Winter*, 555 U.S. at 20; *see also SLS Fed. Servs., LLC v. United States*, 163 Fed. Cl. 596, 607 (2023) (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004)).

No single factor is dispositive, and the weakness of one factor may be sufficient to justify denial of preliminary relief depending on the weight assigned to the remaining factors.  *Sumecht NA, Inc. v. United States*, 923 F.3d 1340, 1348 (Fed. Cir. 2019) (citing *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 953 (Fed. Cir. 1990)).  At the least, the "movant must establish *both* 'likelihood of success on the merits *and* irreparable harm' for the court to grant a preliminary injunction."  *Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 676 F. App'x 980, 984 (Fed. Cir. 2017) (quoting *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001)); *see also Qingdao Taifa Grp. Co. v. United States*, 581 F.3d 1375, 1382 (Fed. Cir. 2009) (noting that irreparable harm and likelihood of success on the merits are the most

influential factors in a preliminary injunction analysis).  In evaluating whether a movant has met

its burden, courts "should be wary of issuing an injunction based solely upon allegations and

conclusory affidavits . . . ."  *Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1575

(Fed. Cir. 1990) (citations omitted).

### B.    Plaintiff Fails to Meet Its Burden to Justify Preliminary Injunctive Relief.

Plaintiff does not make a sufficient showing to justify preliminarily enjoining the Marine

Corps' disqualification decision or MVP's performance of the contract award.  Most critically,

Plaintiff fails to demonstrate that it will likely succeed on the merits of its claim that the Corps

improperly disqualified it from potential award under the Solicitation, which means that Plaintiff

will likely be unable to show it has standing to bring this protest.  Although Plaintiff makes some

showing (albeit weak) that it would be irreparably harmed absent injunctive relief, the potential

harms to the Government that might result from granting a preliminary injunction far outweigh

that minimal showing.  Finally, Plaintiff fails to establish that the public interest favors a

preliminary injunction.  Accordingly, the preliminary-injunction factors weigh strongly against

granting Plaintiff's request for such extraordinary relief.

### 1.    Likelihood of Success on the Merits

The Court reviews agency actions related to procurement solicitations and awards under

the standards of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  *See* 28 U.S.C.

§ 1491(b)(4).  Under the APA, a reviewing court shall "hold unlawful and set aside agency action"

that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5

U.S.C. § 706.  Courts may overturn agency procurement decisions as arbitrary and capricious

"only where '(1) the procurement official's decision lacked a rational basis; or (2) the procurement

procedure involved a violation of regulation or procedure.'"  *Sys. Plus, Inc. v. United States*, 69

Fed. Cl. 757, 766 (2006) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). An agency's action is arbitrary and capricious if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In its Complaint, Plaintiff makes 13 claims challenging the Marine Corps' disqualification of Plaintiff, evaluation of proposals, and award to MVP. *See* ECF No. 1 ¶¶ 46–197. In seeking preliminary injunctive relief, Plaintiff argues that it will likely succeed on the merits of each of those claims. *See* Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. at 9–43, ECF No. 5-1. Counts I and II allege that the Government improperly failed to disqualify MVP for two OCIs. *See* ECF No. 1 ¶¶ 46–69. Counts III, VI, and VIII challenge the SSA's Source Selection Decision, alleging that it failed to adequately describe the trade-off analysis between Plaintiff's and MVP's past performance, *see id.* ¶¶ 70–83; wrongfully assessed Plaintiff's pricing documentation, *see id.* ¶¶ 103–08; and improperly assessed the value the Corps could gain from MVP's higher-cost proposal, *see id.* ¶¶ 146–53. Counts IV, V, VII, and IX challenge the Corps' evaluation of the bid proposals, faulting its rating of Plaintiff's past performance as only "Satisfactory Confidence," *see id.* ¶¶ 84–91, 154–66; its failure to penalize MVP for its "apparent" inability to comply with subcontracting regulations, *see id.* ¶¶ 92–102; and its assignment of various weaknesses to Plaintiff's proposal, *see id.* ¶¶ 109–45. Finally, Counts X, XI, XII, and XIII challenge the Marine Corps' post-award investigation of Plaintiff's handling of protected information and the Corps' decision to disqualify Plaintiff from potential award under the Solicitation on the basis of that

investigation.  Specifically, Plaintiff alleges that the Corps failed to provide it sufficient opportunity to respond to the CO's January 16 email, constituting a violation of administrative due process, *see id.* ¶¶ 167–73; deprived Plaintiff of the right to an unbiased and impartial investigation into alleged conflicts of interest, *see id.* ¶¶ 174–82; acted irrationally, abused its discretion, and acted arbitrarily and capriciously in deciding to disqualify Plaintiff, *see id.* ¶¶ 183–89; and failed to treat offerors equally by disqualifying Plaintiff but declining to disqualify MVP for its "significantly more egregious" conflicts of interest, *see id.* ¶¶ 190–97 (headline-style capitalization removed).[5]

As MVP argues, and as Plaintiff conceded at oral argument, the question of whether Plaintiff's disqualification was improper is a threshold issue in this litigation.  *See* MVP's Mot. to Dismiss & Resp. to Pl.'s Mot. for Prelim. Inj. at 19–20, ECF No. 31; Oral Arg. Tr. at 15:17–16:4, ECF No. 37.  To have standing to bring a bid protest as an "interested party" within the meaning of the Tucker Act, *see* 28 U.S.C. § 1491(b)(1), Plaintiff must show it has a "direct economic interest" that has been or will be affected by the award of a contract or the failure to award a

---

[5] On February 28, 2025, Marathon filed its First Amended Complaint ("FAC") (ECF No. 40) and a Motion for Judgment on the Administrative Record (ECF No. 41).  Most of the claims asserted in the FAC are substantially the same as in the initial Complaint.  *See generally* ECF No. 40.  Count VII adds allegations faulting the CO's assessment of MVP's strengths.  *Id.* ¶¶ 156–80.  Counts X and XI continue to fault the disqualification investigation, framing Marathon's claims through a due-process lens and dropping allegations that the CO herself conducted the investigation of Marathon.  *Id.* ¶¶ 202–35.  Count XII adds an allegation that the CO abused her discretion by failing to seek a size determination for MVP.  *Id.* ¶¶ 236–47.  Count XIII adds an allegation that the CO and Chief of Contracting erred by failing to refer Marathon to the SBA for a certificate of competency.  *Id.* ¶¶ 248–60.  And, in the final substantive change, Count XIV now reflects substantially the same allegations as in Count XII of the original Complaint.  *Compare id.* ¶¶ 261–69, *with* ECF No. 1 ¶¶ 183–89.  Because the preliminary-injunction briefing relies exclusively on citations to the original Complaint, and because the Court's holding here relies on evidence and arguments that have not changed substantially across the two complaints, the Court cites to the original Complaint throughout this Opinion and Order.

contract. *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006). Eligibility for the contract award is part of the showing that a bid protestor must make to support standing. *See Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1360 (Fed. Cir. 2015) (protestor must show that it could "compete for a reopened bid if it wins its protest of the initial contract award"). Here, even if the Court finds in Plaintiff's favor on its remaining claims, Plaintiff will continue to be barred from receiving the TMIT contract award if the Court determines that the Corps' disqualification decision was proper. Accordingly, upholding Plaintiff's disqualification means it does not have standing as an interested party.

For the below reasons, the Court concludes that Plaintiff is unlikely to succeed on its claim that the Marine Corps improperly disqualified it from competing under the Solicitation. The Marine Corps both complied with applicable procedural requirements in conducting its investigation and had a rational basis for the disqualification decision. Because those findings make it unlikely that Plaintiff will have standing to bring this protest, the Court concludes that Plaintiff is unlikely to show success on the merits.

> ### a. Plaintiff Is Unlikely to Show that the Marines Corps' Investigation Was Procedurally Improper.

Plaintiff's procedural challenges to the Marine Corps' investigation largely qualify as due-process challenges to the amount of time the Marine Corps gave Plaintiff to respond to the CO's January 16 email and the manner in which the Corps conducted the investigation. *See* ECF No. 1 ¶¶ 167–82; *see also* Pl.'s Reply in Support of Mot. for Prelim. Inj. at 18–19, ECF No. 34. Plaintiff argues that by imposing a four-hour reply deadline, the Corps failed to give Plaintiff a meaningful opportunity to respond to the CO's email requesting proposals for avoiding or mitigating Plaintiff's appearance of impropriety and conflict of interest. ECF No. 5-1 at 34–35. It further alleges that

the Corps' investigation—during which, Plaintiff alleges, the investigator did not seek any testimony from anyone working for Plaintiff—lacked impartiality and failed to adequately address certain important aspects of the inadvertent disclosure of MVP's source-selection information, including the Corps' own involvement in that disclosure. *See id.* at 35–36; ECF No. 34 at 18–19; ECF No. 37 at 20:18–21:17.

The Government responds that a four-hour deadline during business hours gave Dr. Brooks sufficient opportunity to respond and, alternatively, Plaintiff had ample opportunity to respond to the Marine Corps' concerns over the preceding weeks, during which the parties communicated several times about the Government's concerns over Plaintiff's handling of protected information. *See* Def.'s Resp. to Pl.'s Mot. for Prelim. Inj. at 29–30, ECF No. 32. The Government further argues that, because the investigation was conducted by an independent contracting officer, it was sufficiently impartial. *See id.* at 29. MVP adds that the investigator conducted a thorough investigation, demonstrating his impartiality by finding that the CO "did violate multiple requirements of the Federal Acquisition Regulation." ECF No. 31 at 24. MVP further notes that the burden lies with Plaintiff to show that the investigator was not acting in good faith and argues that Plaintiff has provided no evidence supporting any such conclusion, other than its allegation that the investigator failed to adequately investigate the CO's inadvertent disclosure. *See id.*; *see also* ECF No. 37 at 21:2–17.

Section 555 of the APA "establishes rudimentary 'procedural requirements for informal adjudication[s],'" a category that includes a contracting officer's decision to disqualify an offeror from participating in a procurement. *Sys. Plus*, 69 Fed. Cl. at 767; *see also* 5 U.S.C. § 555. The statutory provision guarantees certain minimal due-process protections, like the right to appear with counsel when compelled to appear in person before an agency and the right to appear "by or

14

with counsel or other duly qualified representative in an agency proceeding." 5 U.S.C. § 555(b). The Supreme Court has analogized the APA's procedural requirements to the constitutional doctrine of procedural due process. *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 655–56 (1990). Under a procedural due-process inquiry, the clear touchstone is whether the plaintiff had "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

The FAR provides contracting officers "considerable discretion to conduct fact-specific inquiries of acquisition proposals to identify potential conflicts." *Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1380 (Fed. Cir. 2024) (quoting *PAI Corp. v. United States*, 614 F.3d 1347, 1352–53 (Fed. Cir. 2010)). Indeed, the Court presumes such officers act in good faith in carrying out their inquiries unless clear and convincing evidence suggests otherwise. *See Bear Mountainside Realty LLC v. United States*, 168 Fed. Cl. 179, 191 (2023). This Court may not substitute its own judgment for that of the agency about what constitutes an adequate investigation. *Oak Grove*, 116 F.4th at 1380.

Plaintiff's notice-and-opportunity argument relies on this Court's decision in *Systems Plus, Inc. v. United States*, 69 Fed. Cl. 757 (2006). In *Systems Plus*, the Court of Federal Claims found that a contracting officer's post-award decision to disqualify an offeror was "procedurally flawed to the point that it was contrary to law." 69 Fed. Cl. at 767. There, the plaintiff was "unaware that the Contracting Officer was addressing [the plaintiff's] alleged access to [proprietary information] until the disqualification decision was rendered on December 9." *Id.* Prior to that decision, the plaintiff "was provided no opportunity to address or to contest the Contracting Officer's suspicions." *Id.* Relying on the APA's informal-adjudication procedural protections, the Court

15

found that because "the Contracting Officer did not provide" the plaintiff "with *any* such opportunity" to be heard, the officer's decision "contravened 'the minimal requirements' for informal adjudication" and was thus contrary to law. *Id.* (quoting *Pension Benefit*, 496 U.S. at 655).

The Government and MVP correctly point out certain distinctions between *Systems Plus* and this case. Here, unlike in *Systems Plus*, Plaintiff was aware of the Marine Corps' investigation into Plaintiff's access to protected information more than a month before the Corps' disqualification decision. And here, unlike in *Systems Plus*, the parties—including Plaintiff's counsel—exchanged extensive communications prior to the disqualification decision concerning Plaintiff's possession and use of the protected information it inadvertently received. On December 3, 2024, the CO emailed Dr. Brooks upon realizing the inadvertent disclosure. App. 83. She expressly notified Dr. Brooks that the Corps would be investigating the incident to determine whether the "inadvertent disclosure could create an unfair competitive advantage or impact the acquisition." *Id.* Plaintiff—through Dr. Brooks—responded to the Corps' notice on December 4, noting that Dr. Brooks had "sought the advice of outside counsel." App. 85. He directly advocated his company's interests to the CO and proposed "an equitable solution to the inadvertent disclosures" based on a GAO decision provided by his counsel. *Id.* (positing that "[the proprietary information] ceased being source selection sensitive after award was made to MVP" and citing *KPMG Peat Marwick* to propose that the Corps disclose Plaintiff's strengths to MVP). The CO responded the next day, alerting Plaintiff that she brought the matter to the attention of agency counsel given her concern of "a potential ethical violation." App. 163.

At this point, and for the next several weeks, Plaintiff's counsel directly engaged with the Corps' counsel and the Department of Justice on Plaintiff's behalf. App. 179 (December 9 email

from Marine Corps' counsel to Mr. Gabig), 186–89 (December 7 email from Mr. Gabig to Department of Justice), 199 (December 10 email from Mr. Gabig to Department of Justice). Most notably, in response to an email from the Corps' counsel asking that Plaintiff follow certain additional remedial steps, Mr. Gabig responded by providing a memorandum "with recommendations on a path forward concerning the inadvertent disclosure of the evaluation of MVP's proposal." App. 196. The six-page memo explained Plaintiff's position that no PIA violation had occurred, because the disclosure was made after award, and provided Plaintiff's recommendation for remediating the disclosure. App. 190–95.

Mr. Gabig then drafted a second memorandum, which he sent directly to the CO on December 18. App. 205. That memo argued that, because Plaintiff had acquired the information concerning MVP's subcontractor via two independent sources, it had not violated the Defend Trade Secrets Act of 2016 ("DTSA"). App. 203. In support of that assertion, Mr. Gabig attached a declaration from Dr. Brooks describing those sources—*i.e.*, MVP's press release and Marathon employees who learned the information from the subcontractor's employees. App. 206–07. Mr. Gabig also argued that Plaintiff had immunity under the DTSA because the CO was the individual responsible for forwarding protected information to the SBA. App. 204.

On December 20, Mr. Gabig sent a final memorandum to the Corps' counsel, asking that the Corps "work with [him] to get quick resolution of any lingering concerns that [the Corps] may have as to potential ethical violations arising from the inadvertent disclosure." App. 215. On January 6, 2025, Mr. Gabig sent one more email to the Corps' counsel "suggesting the parties work together to get the SBA to quickly decide Marathon's size protest." ECF No. 27-1 ¶ 20. These communications between Plaintiff's president, its attorneys, and the Marine Corps firmly establish that not only did Plaintiff have sufficient notice and opportunity to respond, by or with counsel, to

17

"the Contracting Officer's suspicions," *Sys. Plus*, 69 Fed. Cl. at 767, but Plaintiff *actually exercised* its right to do so.

Although Plaintiff provides no authority directly supporting its assertion, the Court agrees that, standing alone, four hours to respond to a disqualification notice from a contracting officer without any additional notice or opportunity to respond may be insufficient under due-process principles. *Cf. id.* (finding a due-process violation where the plaintiff had no awareness of the investigation into its alleged conflict of interest); *Eldridge*, 424 U.S. at 349 (noting that a fundamental requirement of due process is that an opportunity to be heard be "meaningful"). But Plaintiff had significantly more than four hours of notice about the investigation that the Corps conducted. Indeed, although Plaintiff now claims it was "blindsided" by the result of the Corps' investigation, ECF No. 37 at 99:19–20, disqualification was, from the start, a potential outcome. App. 83, 163 (citing FAR 3.104-7, which provides for potential disqualification as a result of any pre-award investigation into PIA violations, as well as authorizing "any other appropriate actions" for post-award violations). Plaintiff thus had six weeks to advance its arguments against any adverse finding from the PIA and ethics investigations. And in fact, Plaintiff actually advanced various legal positions for why it should not be penalized for its access to and handling of the protected information.

What is more, Plaintiff's arguments did not go unheard. Indeed, the investigation report makes clear that the investigator considered Plaintiff's numerous communications in making his final determinations. App. 3–5, 8–12 (noting the emails of Dr. Brooks dated December 4, 5, and 6; the December 10 phone call between Mr. Gabig and Marine Corps counsel; the December 11 email from Mr. Gabig to the Department of Justice, including an attached memorandum; Mr. Gabig's memoranda dated December 18 and 20 and draft complaint). For example, he noted

18

Plaintiff's legal argument that it had not improperly retained the protected information, and he cited a wide array of regulations, statutes, and agency-level and judicial opinions that the investigator believed rebutted Plaintiff's positions. App. 12–26. The Corps' thorough review of Plaintiff's arguments underscores that Plaintiff had more than ample opportunity to respond to the Corps' allegations.

Finally, even assuming the CO's four-hour deadline provided insufficient notice-and-opportunity under these facts, Plaintiff does not demonstrate harm because it does not explain what additional response it would have provided to the CO. *See IAP Worldwide Servs., Inc. v. United States*, 160 Fed. Cl. 57, 86 (2022) (noting in a bid protest action that "[APA] [s]ection 706 instructs courts that 'due account shall be taken of the rule of prejudicial error'" (quoting *Am. Relocation Connections, LLC v. United States*, 789 F. App'x 221, 228 (Fed. Cir. 2019))). Indeed, although the CO emailed only Dr. Brooks, without copying his attorneys, it appears that Dr. Brooks forwarded the email to Plaintiff's outside counsel, Mr. Lockwood, before the close of business (Eastern Time) on January 16. App. 570. Mr. Lockwood responded to the CO the same day, denying the CO's assertions of an appearance of impropriety and OCI. *Id.* Mr. Lockwood specifically noted that his client had "provided [the Corps] with arguments in defense along the way, along with suggestions on how the situation might be resolved." *Id.* And he conceded that, "[i]n terms of a specific mitigation," he did not know "what else [the Corps] would expect [Plaintiff] to do or provide." *Id.* In essence, Mr. Lockwood acknowledged that Plaintiff had already presented any available legal arguments. Nowhere in Plaintiff's briefing does it explain what additional response it would have provided to the Corps' stated concerns and request for proposed mitigation steps had the CO provided a more reasonable amount of time to reply.

At bottom, the Corps provided sufficient notice that it was investigating potential PIA violations related to the inadvertent disclosure and potential ethical violations related to Plaintiff's handling of MVP's proprietary information. It engaged in back-and-forth communications with Plaintiff and its attorneys, and it considered numerous arguments that Plaintiff made in support of its positions. The process that the Corps afforded to Plaintiff more than likely suffices under procedural due-process requirements, since Plaintiff's opportunity to respond to the Corps' allegations was meaningful both in time and in manner. *See Eldridge*, 424 U.S. at 333. Thus, Plaintiff is unlikely to succeed on its claim that alleged due-process violations rendered the Corps' investigation contrary to law.

Plaintiff also challenges the Corps' investigation on bias and impartiality grounds, arguing that the CO who was responsible for the inadvertent disclosure of protected information had sufficient bias such that her involvement with the investigation into Plaintiff's handling of protected information deprived Plaintiff of the right to an impartial investigation conducted by an independent third party. ECF No. 1 ¶¶ 174–82; ECF No. 5-1 at 35–36. Without question, the right to due process includes a right to "a fair process of decision making," *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972), a right that may be violated if "personal bias or prejudice is apparent in the conduct of the administrative proceedings" or if the "agency decision was 'made by adjudicators with a pecuniary interest in the results.'" *Krzywicki v. Del Toro*, No. 21-cv-1508, 2024 WL 4598338, at *10 (D.D.C. Oct. 29, 2024) (quoting *Jonal Corp. v. District of Columbia*, 533 F.2d 1192, 1197 (D.C. Cir. 1976)). As the Government makes clear, though, Plaintiff's claim is largely premised on a factual inaccuracy—an inaccuracy that has since been removed from Plaintiff's FAC. *See* ECF No. 32 at 29; *see also* ECF No. 31 at 23–24; ECF No. 40 ¶¶ 202–35, 261–69. On December 13, 2024, the Marine Corps appointed an independent contracting officer to investigate alleged

20

PIA violations arising from the inadvertent disclosure of MVP's proprietary information.  App. 1, 33.  The Corps directed him to "obtain the available information and documentation" from the CO responsible for the Solicitation.  App. 33.  Although the CO responsible for the disclosure likely participated in the investigation, given that the investigator was directed to obtain relevant materials from her, the CO was not ultimately responsible for conducting the investigation and issuing final recommendations.

Faced with that evidence, Plaintiff's claim reduces to an argument that the investigation as a whole was biased, given that the Marine Corps generally had an incentive to deflect blame.  Plaintiff also argues that the investigation itself was inadequate, for instance, by failing to fully investigate how the protected information wound up being disclosed.  *See, e.g.*, ECF No. 37 at 20:24–21:5.  Without a per se conflict of interest of the investigator, like apparent personal bias or a pecuniary interest in the outcome of the investigation, any bias allegation that remains runs up against the well-established rule that a plaintiff must "overcome the presumption that a government official is acting in good faith."  *Bear Mountainside*, 168 Fed. Cl. at 191.  To make that showing, Plaintiff must provide "[a]lmost irrefragable proof," or "clear and convincing evidence," of bad faith, generally including a showing of "some specific intent to injure the plaintiff."  *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (quoting *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1139–40 (Fed. Cir. 2002)).  Plaintiff's burden is higher still because of the additional deference this Court gives to "the agency's investigative process," including contracting officers' "considerable discretion to conduct fact-specific inquiries of acquisition proposals to identify potential conflicts."  *Oak Grove*, 116 F.4th at 1380 (quoting *PAI Corp.*, 614 F.3d at 1352).

21

Plaintiff is unlikely to show that the investigation was tainted by bias or was otherwise inadequate. The investigator completed a thorough 31-page report outlining the results of his investigation. *See* App. 1–31. That report contains a full factual recitation, describing in detail communications between Plaintiff and the Corps, including communications with the CO and agency counsel. App. 2–12. It is unclear from the record itself how the investigator gathered the information he included in the report—*i.e.*, whether through interviews or by reviewing written communications—but Plaintiff has provided no evidence that would make the Court question the investigative process, which resulted in a comprehensive and balanced assessment of the various issues related to the inadvertent disclosure of protected information. The report further outlines relevant and applicable statutes and regulations and continues with in-depth analysis of the key issues within the scope of the investigation, including the CO's inadvertent disclosure of information, under the PIA as well as several other FAR requirements. App. 12–17.

Plaintiff faults the investigator's decision to conduct a "legal review of regulations [and] case law," arguing that there is no evidence the investigator "is a lawyer." ECF No. 37 at 31:16–18. But the Court would expect that a contracting officer charged with applying statutes, regulations, and this Court's caselaw to procurement decisions is in a position to assess the legal requirements that prescribe the standards and procedures by which he does his job. To include such analysis is certainly not improper—indeed, it may likely be necessary to support the decision. And the report does not display any failure to gather relevant information. Plaintiff primarily argues that the investigator could have interviewed Plaintiff's employees, like Dr. Brooks, to resolve the Corps' concerns about Plaintiff's handling of the information. *See id.* at 33:14–21. But Plaintiff does not explain how such interviews might shed additional light on the alleged procurement and ethics violations, given that such violations do not require any finding of

subjective intent on Plaintiff's part. *See Raytheon*, 170 Fed. Cl. at 584 (explaining that the mere appearance of impropriety can be sufficient to exclude an offeror). In any event, the existing record contained sufficient evidence—including numerous emails and declarations from Dr. Brooks—to make determinations on the alleged violations. Further, even if the Court believed the investigator could have performed additional investigative work, Plaintiff fails to provide any evidence that the investigation lacked some required procedure or failed to consider some important argument, a showing that is required to overcome the significant discretion that the Court affords to agencies to decide the process by which they conduct conflict-of-interest investigations. *See Oak Grove*, 116 F.4th at 1380.

Finally, Plaintiff provides no evidence, let alone clear and convincing evidence, to defeat the presumption that the investigator conducted his investigation in good faith. And the limited record before the Court at this stage does not support such finding. Rather, it shows that the investigator accurately described the Corps' disclosure of protected information and impartially reviewed the CO's communications. *See* App. 2. He reasonably concluded that the disclosure occurred "inadvertently and unknowingly" because the documentary trail suggested that the CO only re-reviewed the documents she sent to Dr. Brooks after Plaintiff filed its size and agency-level protests. *Id.* The CO promptly sent a notification email to Plaintiff on December 3, only one day after receiving those protests, and indicated that the disclosure was inadvertent. App. 3. Undermining the contention that the Corps has an interest in deflecting blame, the report specifically concludes that, although the CO's disclosure "did not violate the PIA," it "was still improper" and violated various FAR requirements. App. 16. Such determination alone is sufficient, in the Court's view, to indicate that Plaintiff is unlikely to meet its heavy burden to

overcome the presumption of good faith to show that the Corps' investigation was in some way biased.

In sum, Plaintiff is unlikely to succeed on its claims that the Corps' investigation into the disclosure of protected information was procedurally improper. The Corps provided Plaintiff sufficient notice and an opportunity to respond to the Corps' concerns. And Plaintiff provides no basis to question the Corps' investigation process or to believe the investigation was tainted by improper bias.

> b. *The Marines Corps' Justifications for Disqualifying Plaintiff Are Unlikely to Be Arbitrary or Capricious, Contrary to Law, or an Abuse of Discretion.*

Substantively, Plaintiff challenges the bases on which the Marine Corps rested its decision to disqualify Plaintiff from possible award under the Solicitation. Specifically, those grounds include that: (1) "Marathon Targets has an OCI and an unfair competitive advantage that cannot be neutralized, avoided, or mitigated;" (2) "Marathon Targets has demonstrated the appearance of impropriety in violation of relevant FAR provisions noted" earlier in the decision; and (3) "Marathon Targets is not a responsible contractor and is unqualified and ineligible because it does not meet the standard in [FAR] 9.104-1(g)." App. 32. Each determination is an independent basis for disqualification. Plaintiff claims those determinations were arbitrary and capricious, an abuse of discretion, and contrary to law. ECF No. 1 ¶¶ 183–89; ECF No. 5-1 at 36–42. The Court disagrees. At the very least, Plaintiff is unlikely to show that the Corps' appearance-of-impropriety finding fails to survive APA review.[6]

---

[6] Given this conclusion, the Court need not consider the other two bases of the disqualification decision to resolve Plaintiff's motion.

The APA requires courts to give significant deference to an agency's exercise of judgment. Although courts review questions of law—like the interpretation of statutes—de novo, *see Oak Grove*, 116 F.4th at 1379, they apply the arbitrary-and-capricious standard to review challenges involving an agency official's fact-specific investigation and decision to exclude bidders for the appearance of impropriety, *see Raytheon*, 170 Fed. Cl. at 583–84; *NKF Eng'g, Inc. v. United States*, 805 F.3d 372, 376–77 (Fed. Cir. 1986); *SAGAM Securite Senegal v. United States*, No. 2021-2279, 2023 WL 6632915, at *8 (Fed. Cir. Oct. 12, 2023). Under the APA's substantive standards, the Court may set aside a procurement decision only if it lacked a rational basis. *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009). To determine whether that has occurred, the Court must determine "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Id.* (quoting *Impresa*, 238 F.3d at 1332). The "disappointed bidder bears a heavy burden" of showing that the action had no rational basis. *Id.* (quoting *Impresa*, 238 F.3d at 1333).

Independently, the FAR provides contracting officers with discretion to disqualify offerors for an appearance of impropriety that might affect the integrity of the procurement system. The FAR makes clear that transactions "relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct." FAR 3.101-1; *see also* FAR 3.1002(a) ("Government contractors must conduct themselves with the highest degree of integrity and honesty."). Under the regulation, the "general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships." FAR 3.101-1. Assessment of an appearance of impropriety is objective: "the *appearance* of impropriety (or conflict of interest), by definition, means that an objective observer might believe there is an impropriety, even where the facts, when fully investigated, would not support a finding of an *actual*

25

legal violation or impropriety in the procurement." *Raytheon*, 170 Fed. Cl. at 581.  For decades, the Federal Circuit has affirmed that an agency's conclusion that "an appearance of impropriety existed" can alone justify disqualification of a prospective offeror.  *NKF Eng'g*, 805 F.2d at 376–77; *see also DynCorp Int'l, LLC v. United States*, 757 F. App'x 927, 931–32 (Fed. Cir. 2018) (restating the *NKF* rule and deferring to the agency's determination that an appearance of impropriety did not exist).  As with all procurement decisions, the agency's disqualification discretion is "nearly unlimited." *Raytheon*, 170 Fed. Cl. at 584.

The Court finds that the Corps possessed ample evidence to support its determination that Plaintiff demonstrated the appearance of impropriety in its conduct following receipt of the protected information that the CO inadvertently disclosed.  The record demonstrates a clear rational basis—*i.e.*, the record contains sufficient "hard facts" indicating the potential existence of impropriety, *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1387 (Fed. Cir. 2011)—for the Corps to conclude that Plaintiff had failed to demonstrate that it acted in accordance with ethical and legal obligations concerning the retention and use of proprietary and source selection information.  *See* App. 20.  The record further supports the Corps' concern that Plaintiff's actions after receiving the inadvertent disclosure could tend to harm the integrity of the bidding system. *See NKF Eng'g*, 805 F.2d at 378.  Plaintiff is therefore unlikely to succeed on its claim that the Corps acted contrary to law, irrationally, or in an arbitrary and capricious manner by making that determination.

The Court focuses on three examples of conduct that alone provide sufficient support for the Corps' disqualification decision based on the appearance of impropriety: (1) Plaintiff's misrepresentation of MVP's press release as a basis for its knowledge of the identity of MVP's subcontractor; (2) Plaintiff's apparently contrived use of an employee's post-protest

communication as a basis for that knowledge; and (3) Plaintiff's distribution of protected material to non-attorneys working inside and outside the company and, following notification of the inadvertent disclosure, its legally unjustified attempts to retain the information.

First, and perhaps most directly relevant to a finding that Plaintiff's actions harmed the integrity of the procurement process and that Plaintiff itself lacked integrity, the Corps had sufficient evidence to reasonably conclude that Plaintiff "manufacture[d]" knowledge on which it allegedly relied to advance its size protest and agency-level protest. App. 11. In response to the Corps' concerns about Plaintiff's knowledge of protected information (*i.e.*, the identity of MVP's subcontractor), Dr. Brooks submitted a declaration to the Corps through his counsel with the following claim: "This declaration is to let it be known that on December 2, 2024 (the day the Small Business Size Protest was filed), Marathon had independent knowledge that Corps Solutions was MVP's subcontractor." App. 206. Plaintiff then cited a press release that MVP issued on LinkedIn, a press release that Plaintiff claimed provided it the "independent knowledge" on which it relied. *Id.* As Defendant's evidence clearly establishes, that assertion cannot be true. *See* App. 262–63, 267–68. Although the press release describing MVP's award of the TMIT contract was dated November 27, 2024, MVP did not release it until December 10, eight days after Plaintiff's size protest and seven days before Dr. Brooks signed his declaration. *See* App. 206, 267–68. Indeed, MVP sought the Marine Corps' approval of the press release, which it did not receive until December 4, 2024. App. 211.

Given that evidence, the Marine Corps' investigator determined that Dr. Brooks' first assertion of independent knowledge was "unsupported, factually incorrect, and clearly manufactured after the fact to support [Plaintiff's] argument." App. 11. The investigator further determined that Plaintiff's "decision to manufacture evidence demonstrates a lack of integrity."

*Id.* Both conclusions were rational. Because the Brooks Declaration affirmatively asserted that Plaintiff "had" knowledge of MVP's subcontractor from the press release on December 2 when the press release was not yet public, the investigator was well within his discretion to determine that Plaintiff failed to be "truthful in its interactions with the Government and during competitions for federal contracting awards."[7] *Id.*; *see also* FAR 1.102(a)–(b), 3.101-1. In the same vein, the Chief of Contracting was well within her discretion to accept his finding and disqualification recommendation. Integrity, fairness, openness, and an otherwise "impeccable" standard of conduct are key elements of ensuring that the integrity of the procurement system is maintained. FAR 1.102(b)(3), 3.101-1; *NKF Eng'g*, 805 F.2d at 377. Plaintiff's misrepresentation of its means for obtaining protected information sufficiently constitutes the kind of "hard facts" necessary to support finding an appearance of impropriety.[8] Plaintiff thus fails to show that it will likely

---

[7] Plaintiff submitted a declaration from Mr. Gabig to this Court that raises a substantially similar evidentiary claim. *See generally* ECF No. 27-1. Mr. Gabig moderated his language slightly, noting only that "the identity" of the subcontractor "was also available from an independent source." *Id.* ¶ 9. The declaration does not affirmatively state that Plaintiff actually obtained or "had" information from that source on December 2. *See id.* But the assertion that such information was widely available, or that it was available from the press release, still appears to be factually incorrect, although Plaintiffs have subsequently alleged in the FAC that they obtained knowledge of the subcontractor's identity from a March 2024 LinkedIn job announcement. *See* ECF No. 40 ¶¶ 9–11. Faced with the Government's clear evidence that the press release was not public, Plaintiff's counsel clarified that they are not "advancing any argument to this Court that Marathon knew of the identity of MVP's subcontractor based on the press release." ECF No. 34 at 6 n.1. Plaintiff's counsel further acknowledged that Mr. Brooks' declaration was "improvidently worded, to say the least." ECF No. 37 at 26:16–17.

[8] In its FAC, Plaintiff acknowledges that Dr. Brooks' assertion that Marathon's independent knowledge of MVP's subcontractor stemmed from the press release was a "serious mistake." ECF No. 40 ¶ 50. Plaintiff insists that the "subject" of Dr. Brooks' claim—that "Marathon had independent knowledge" of the subcontractor's identity—"remains verifiably true," considering certain evidence Plaintiff subsequently uncovered on LinkedIn. *Id.* But the issue is not whether Marathon actually had independent knowledge of the subcontractor's identity, it is that Dr. Brooks misrepresented the basis of his knowledge to the Corps.

succeed on its claim that such a determination was contrary to law or otherwise arbitrary and capricious.

Second, the Corps had a rational basis to determine that Marathon provided "unsupported and factually incorrect" assertions that it independently discovered the identity of MVP's subcontractor, prior to its size and agency-level protests, from employees who worked at one of the sites where the subcontractor also performs its duties under the current contract. App. 11. The investigator determined that Dr. Brooks essentially manufactured this evidence after receiving the CO's inadvertent disclosure and filing Plaintiff's size protest. In his view, Dr. Brooks' representation was unsupported because Dr. Brooks solicited and received the email from his employee, which Dr. Brooks attached to his declaration, on "3 December 2024," "well after Marathon drafted and submitted" its "size protest." *Id.* That determination comports with the evidence submitted to the Court. The email that Dr. Brooks attached as evidence was sent by an employee in Hawaii on December 2, 2024, at 7:51 p.m. *See* App. 210. The investigator determined that the email reflected a Hawaii timestamp, suggesting it had been sent past midnight Eastern Time on December 3, later than Plaintiff's submission of its size protest. App. 11. As above, the investigator determined that Dr. Brooks misrepresented Plaintiff's basis for its knowledge of protected information, *id.*, because, if he received information about MVP's subcontractor only in the early morning hours of December 3, then the information could not have been "passed along" to Dr. Brooks "on December 2, 2024," or prior to filing the size protest. App. 206. This conclusion was rational, and so was the investigator's conclusion that the misrepresentation "detract[ed] from Marathon's responsibility to be truthful in its interactions with the Government and during competitions for federal contract awards." App. 11. Thus, as above,

Plaintiff fails to show it will likely succeed on its claim that this determination, and the resulting disqualification decision, was arbitrary and capricious, contrary to law, or otherwise irrational.

Finally, the investigator rationally concluded that Plaintiff's actions after receiving the protected information demonstrated a lack of integrity and honesty that could provide a basis for concluding that Plaintiff created an appearance of impropriety. *See* App. 25 (citing FAR 3.101-1, 3.1002(a)). Such conclusion is sufficiently supported by the record. The thrust of the investigation into Plaintiff's conduct concerned Plaintiff's failure to recognize and act on its "responsibilities and obligations" related to receiving "information that clearly contained its competitor's proposal and source selection information." App. 20. Indeed, Plaintiff was clearly on notice that the materials it received contained source selection information, as is shown by the face of MVP's TET evaluation. App. 47–50; *see also* App. 163. Each page of the evaluation report included markings noting that it contained "Source Selection Information" classified as confidential under "FAR 2.101 and 3.104." App. 47–50. But rather than treating the information as confidential, Plaintiff "closely scrutinized MVP's strengths," App. 85, and disseminated the information, which ultimately reached 11 individuals, including non-attorneys and individuals who do not work for Marathon. *See* App. 4, 8.

Plaintiff's counsel, Mr. Gabig, argued to the Corps that *every* page in the technical evaluation—including on pages containing Plaintiff's ratings—had the same marking, making it reasonable to conclude that the footer "was simply to be ignored." ECF No. 27-1 ¶ 6 (quoting App. 193). But the pages containing MVP's technical evaluation also contained MVP's name in a prominent location. *See* App. 47. And Plaintiff acted on the information it received with clear knowledge that the technical evaluation could provide some use to Plaintiff, given that Plaintiff had already "ensconced" MVP's strengths in a draft bid protest by the time the Corps sought to

claw back the inadvertently disclosed materials. App. 85. Participants in a federal procurement are "charged with knowledge of law and fact appropriate to the subject matter . . . ." *Turner Constr. Co. v. United States*, 367 F.3d 1319, 1321 (Fed. Cir. 2004). As relevant here, the FAR places significant restrictions on the use of confidential bid information. *See* FAR 2.101, 3.104-1, 3.104-3. Given that the parties agree the inadvertent disclosure was improper, the investigator reasonably concluded that Plaintiff's attorney, "who has decades of experience in bid protests" and "possessed an ethical and legal obligation to report the disclosure to the Government," and other experienced Marathon employees "should have been fully aware that they had received improperly provided, protected source selection information." App. 20. Plaintiff is unlikely to succeed in arguing otherwise.

Plaintiff's position on its entitlement to retain and use the protected information following the clawback request from the Marine Corps further weakens its position that the Corps' appearance-of-impropriety determination lacks a rational basis. Dr. Brooks' email in response to the CO's inadvertent disclosure notice did, in Plaintiff's favor, "commit" that Plaintiff "shall honor each of [the Corps'] four [remediation] requests," but only after first positing that the information "ceased being source selection sensitive after award was made to MVP." App. 85. Dr. Brooks then went on to note that the Corps' request would likely be only a "cosmetic fix to the problem," and that the Corps could not "unring" the bell. *Id.* Plaintiff's counsel, Mr. Gabig, further pressed this legal position in his December 11 memorandum, and additionally argued that the materials lost their protected status by being publicly disclosed and by the Corps' failing to alert Dr. Brooks of the inadvertent disclosure within two days. App. 191–93.

The Corps faulted Plaintiff's unjustified legal positions about the continued confidentiality of the information and Plaintiff's claimed right to use the information it received to challenge

MVP's award.  *See* App. 4, 8–9.  Setting aside the question of whether Plaintiff had a right to use the information it received in a subsequent protest, Plaintiff's reluctance to acknowledge that the inadvertently disclosed materials continued to be confidential source selection material serves as an adequate basis for the Corps to conclude that Plaintiff had created the appearance of impropriety.  The investigator reasonably rejected Plaintiff's legal arguments.  App. 28–29.  Indeed, perhaps tellingly, Plaintiff does not assert in this protest its position that the information lost its protected status.  In conjunction with Plaintiff's "frequently unsupported" and "factually incorrect attempts to retain and use this information," App. 21, the Corps rationally determined that Plaintiff had created the appearance of impropriety.

*     *     *

At this preliminary stage based on the record currently before the Court, Plaintiff fails to show it will likely succeed on its claim that the Corps' disqualification decision was improper.  As a result, Plaintiff fails to demonstrate it will likely succeed on any of its remaining claims because it is likely not an interested party within the meaning of the Tucker Act and as such would lack standing to protest the evaluation of its proposal or MVP's award.[9]

### 2.    Irreparable Harm

Plaintiffs seeking preliminary relief must also demonstrate "that irreparable harm is *likely*"—not merely possible—"in the absence of an injunction."  *Winter*, 555 U.S. at 22.  The touchstone inquiry is whether the movant "has 'an adequate remedy in the absence of an injunction.'"  *Legacy Corp. of Ill. v. United States*, 172 Fed. Cl. 314, 317 (2024) (quoting *GEO*

---

[9] For this reason, the Court declines to address Plaintiff's challenges to the Corps' evaluation of proposals, including claims that the SSA's Source Selection Decision did not adequately describe the Marine Corps' trade-off analysis, that the Corps improperly evaluated proposals, and that MVP should have been disqualified for alleged OCIs.

*Grp., Inc. v. United States*, 100 Fed. Cl. 223, 228 (2011)).  For the purposes of a permanent injunction, "lost profits and business from a government contract may constitute an irreparable harm."  *Harmonia Holdings Grp., LLC v. United States*, 156 Fed. Cl. 238, 247 (2021) (citing *Springfield Parcel C, LLC v. United States*, 124 Fed. Cl. 163, 194 (2015)).  But the focus at the preliminary injunction stage is "on any alleged irreparable harm that may be incurred *during the pendency of the litigation* absent preliminary relief."  *Id.* (citing *Sierra Mil. Health Servs. v. United States*, 58 Fed. Cl. 573, 582 (2003)).  If the harm a plaintiff identifies might equally be remedied by an eventual permanent injunction, then it has failed to meet its burden to show irreparable harm necessary to obtain preliminary relief.

Plaintiff's first basis for alleging irreparable harm is that it will lose profits and potential work from the TMIT contract that it did not obtain.  *See* ECF No. 5-1 at 43.  Plaintiff argues that this Court "presumes" irreparable harm when "apparent evaluation errors have resulted in the loss of an award."  *Id.*  As MVP rightly notes, though, such harms are more properly characterized as harms that might justify permanent injunctive relief—*i.e.*, harms that could be remedied at the conclusion of litigation by a final judgment in Plaintiff's favor.  *See* ECF No. 31 at 44; *see also Navient Sols., LLC v. United States*, 141 Fed. Cl. 181, 184 (2018) ("[A preliminary] injunction is not intended to prevent all harm that could befall a plaintiff during a pending litigation, but only that harm that could stem from failing to preserve the status quo while the case is pending."). Indeed, the gravamen of Plaintiff's allegations suggest it seeks to avoid the loss that occurs any time an incumbent contractor loses out on a successor contract.  But the "'potential loss of the benefits of incumbency does not' amount to irreparable harm" necessary to obtain preliminary injunctive relief.  *Navient*, 141 Fed. Cl. at 184 (quoting *Akima Intra-Data, LLC v. United States*, 120 Fed. Cl. 25, 28 (2015)).  Because the lost profits and work that Plaintiff alleges it will suffer

33

from the loss of the contract could be remedied in the future, irrespective of preliminary injunctive relief, the Court lends no weight to these harm allegations for present purposes.

Plaintiff's second allegation of harm ties more closely to the harms it alleges it will suffer during and as a result of the immediate transitional phase between the current and forthcoming contracts. Specifically, Plaintiff alleges that it will lose employees if all its current contracts with the Marine Corps end and that it will be forced to incur certain costs that, without injunctive relief, might never be redressed. Dr. Brooks indicates that the "Marine Corps is by far Marathon's largest customer," accounting for "approximately [. . .]% of Marathon's revenue." Brooks Decl. ¶ 5, ECF No. 25-1. Although he does not identify exactly how much revenue Plaintiff stands to lose from the various contracts that end on March 19, 2025, and more specifically the current TMIT contract, Dr. Brooks notes that "Marathon expects to do no business with the Marine Corps," except for a Special Operations contract of an unspecified amount, after that date "if the transition is not enjoined." *Id.* Plaintiff predicts that "a [. . .]% drop in revenue would lead to a [. . .]% reduction in headcount: i.e. Marathon would need to lay off [. . .] people." *Id.* ¶ 6. Dr. Brooks believes that these employees "may find work" with "MVP, operating TMITs" if the transition occurs as planned. *Id.* ¶ 9. He further alleges there would be an inevitable "flow" of intellectual property to MVP, which "would be an unmitigated disaster for Marathon." *Id.*

Plaintiff also identifies several investments it has made that, without securing future Marine Corps contracts, would face an uncertain future: [. . .]. *Id.* ¶ 12; *see also id.* ¶ 11. Notably, while Plaintiff indicates its financial outlook would be significantly worse without a preliminary injunction, it does not indicate in its evidentiary submission that it would suffer an irreparable harm to the viability of its business. Indeed, although acknowledging that it would be expensive, Plaintiff represents that it may be able to retain some staff "by continuing to pay their salaries in

the absence of work, while the Court considers Marathon's case." *Id.* ¶ 14. And, finally, Plaintiff alleges that it would incur "the cost of shipping all its equipment" to execute the transition only to "ship it back again if the award to MVP is overturned." *Id.* ¶ 19.

Like Plaintiff's first category of alleged harm, much of the evidence it provides in the Brooks Declaration ties to the long-term losses it might suffer from failing to receive the TMIT contract award at issue in this litigation. Indeed, many of Plaintiff's alleged harms neatly fit within the "kinds of 'harms [that] are the sorts of things that any incumbent would experience upon the loss of a successor contract.'" *IBM Corp. v. United States*, 118 Fed. Cl. 677, 685 (2014) (quoting *CRAssociates, Inc. v. United States*, 103 Fed. Cl. 23, 26 (2012)). For example, although Plaintiff appears to have made certain financial commitments that extend beyond the end date of its current contracts, *see, e.g.*, ECF No. 25-1 ¶¶ 11–12 (describing a [. . .] and a [. . .]), it has no right to continue receiving payments from the Government past the end date of its current contract as the incumbent on the project. *Navient*, 141 Fed. Cl. at 184. The risk that Plaintiff cannot sustain its long-term commitments, which extend beyond the current contract's expiration, cannot serve as a basis to show irreparable harm in the short-term (*i.e.*, while this protest is pending) sufficient to justify preliminary relief.

To be sure, significant business impacts—like a possibility that a business "may cease to exist altogether" from layoffs and a loss in revenue before the litigation is finally resolved—might show significant harm at the preliminary injunction stage. *FMS Inv. Corp. v. United States*, 136 Fed. Cl. 439, 443 (2018). But Plaintiff has essentially conceded that it will not imminently cease to do business, given that it might retain some staff by paying them during the pendency of this litigation. *See* ECF No. 25-1 ¶ 14. And, in any event, this Court has held in similar circumstances that a plaintiff does not suffer irreparable harm, even where it "depends" upon payments from the

Government, when its "financial strain is 'the unavoidable result' of its [contract] coming to an end." *Navient*, 141 Fed. Cl. at 185 (quoting *Telos Corp. v. United States*, 129 Fed. Cl. 573, 578 (2016)).

Other harms alleged by Plaintiff border on speculative and non-specific. *See Winter*, 555 U.S. at 22. Plaintiff posits that the [. . .] employees it is projected to lay off "may find work" with MVP or its subcontractor but cites to only one such instance to date. *See* ECF No. 25-1 ¶ 9 (noting that one employee accepted an offer with MVP's subcontractor). It further presumes that some "flow" of intellectual property will occur should it lose its employees to MVP after the new TMIT contract commences, *see id.* ¶¶ 9–10, though it does not identify what type of information would likely be disclosed, how disclosure of such information would specifically harm Plaintiff, or why other measures to prevent or remedy such disclosures are unavailable. It also alleges that "[i]f Marathon is not able to re-hire former staff, it will have to hire new staff and train them." *Id.* ¶ 15. But Plaintiff has no way to predict how likely or unlikely it will be to rehire any former employees. Although, if providing TMIT services is "a very niche industry," *id.* ¶ 7, as Plaintiff claims, one would reasonably assume that any employees who migrated to MVP under the new TMIT contract would come back to Plaintiff should Plaintiff succeed in its protest and be selected as the awardee.

The costs that Plaintiff *has* shown it could irreparably lose in the short-term absent a preliminary injunction are the transitional costs it would incur in removing its equipment, vacating its facilities at Marine Corps bases, and then returning at some future date. *Id.* ¶ 19. But the Court affords minimal weight to those allegations. They differ only in degree from the kinds of harms incumbents suffer whenever they fail to receive the award for a successor contract. Further, the Brooks Declaration fails to quantify in a meaningful way any of those damages. In short, these harms weigh in Plaintiff's favor, but only weakly.

36

One final note on harm.  It is unclear from the evidence before the Court that enjoining either Plaintiff's disqualification or MVP's performance of the award is certain to remedy any form of harm that Plaintiff alleges.  Specifically, as the parties agree, the current contract under which Plaintiff is performing does not provide for further extensions.  *See* ECF No. 37 at 42:18–25; ECF No. 25-1 ¶ 23 ("The current . . . TMIT contract has no options and has hit its ceiling . . . ."); *cf.* App. 565–69 (Burns Decl. ¶¶ 11–17) (averring that an injunction would result in a gap in TMIT services).  Plaintiff believes that it would be in a strong position to obtain a bridge contract because it is currently performing as the primary subcontractor, but the Government responds that there is no guarantee that Plaintiff would receive such contract, especially because transition activities are already underway.  *See* ECF No. 37 at 74:6–13; ECF No. 25-1 ¶ 4 ("Marathon has also begun modifying its operations in anticipation of a possible March 19th end-date . . . ."); Connell Decl. at 1, ECF No. 31-1 ("Since receipt of the Phase-In task order on November 27, 2024, MVP has invested in the manufacturing of [. . .] TMIT systems, . . . transportation & operation trailers, supporting accessories, and consumables for three months of TMIT operation.").  Without any remaining options to extend its current contracts, Plaintiff's ability to continue performing under a hypothetical contract during the pendency of this protest is speculative.

      3.   <u>Remaining Factors</u>

The remaining preliminary-injunctive factors require the Court to (1) weigh the alleged harm that the movant might suffer without preliminary relief against the harm to the Government and any third-party intervenor if the motion is granted, *see Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 320 (2009); and (2) determine whether the public interest favors issuing the preliminary injunction, *see Winter*, 555 U.S. at 24.

As described above, Plaintiff makes a weak showing that it would be irreparably harmed without preliminary injunctive relief.  *See supra* Section II.B.2.  Without such relief, Plaintiff will suffer the permanent loss of certain transitional costs as the parties continue phasing-in MVP's participation in the Marine Corps' TMIT program.  *See* ECF No. 25-1 ¶ 19.  Plaintiff believes the Government will suffer minimal harm—and might "benefit by up to $[. . .] million," *see* ECF No. 5-1 at 44—if the Court preliminarily enjoins Plaintiff's disqualification and MVP's performance of the award.  It further argues that granting preliminary injunctive relief would serve the public interest by protecting and preserving the integrity of the procurement process.  *See id.*

The Government, relying on representations from the Marine Corps, argues that a preliminary injunction would impose "substantial risk of harm" on the Corps and on the national security of the United States.  ECF No. 32 at 36–37; *see also* App. 565–68 (Burns Decl. ¶¶ 11–17).  Specifically, an injunction would, according to the Corps, result in a gap in services that are necessary to train Marines to "improve weapons proficiency and lethality on moving threats/moving engagements."  App. 568 (Burns Decl. ¶ 14).  Further, the Government argues that the public interest in "honest, open, and fair competition in the procurement process" would be significantly harmed by "reward[ing]" Plaintiff for improperly retaining proprietary information and benefitting from an unfair competitive advantage in this procurement.  ECF No. 32 at 38 (quoting *Aero Corp. v. United States*, 38 Fed. Cl. 237, 242 (1997)).

For its part, MVP notes that it has invested significantly in TMIT systems, has begun implementing transitional activities to prepare for assuming its role as the contractor responsible for providing TMIT services, and has begun hiring additional staff and personnel dedicated to providing these new services to the Marine Corps.  *See* ECF No. 31 at 46; *see also* ECF No. 31-1

at 1.  It argues that the public interest supports "minimizing disruption" to the Government's services.  ECF No. 31 at 46 (quoting *Blue Tech Inc. v. United States*, 155 Fed. Cl. 229, 247 (2021)).

Considering each party's circumstances, the balance of harms weighs heavily against Plaintiff.  The harm showing that Plaintiff has made, while not inexistent, is weak at best.  On the other hand, the Government and MVP have asserted specific harms—both to the Marine Corps' interests and to the public interest—that might result from a preliminary injunction.  As the Government notes, Congress has instructed this Court to "give due regard to the interests of national defense and national security" in assessing challenges to procurement solicitations and awards.  28 U.S.C. § 1491(b)(3); *see also Winter*, 555 U.S. at 24 ("We 'give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest.'" (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986))).  Indeed, the Court "accedes to the professional judgment of military officials unless the government's assertion is entirely without basis or 'completely without foundation.'"  *Crowley Tech. Mgmt., Inc. v. United States*, 123 Fed. Cl. 253, 267 (2015) (quoting *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 656 (2003)).

Here, the Marine Corps has sufficiently explained that enjoining MVP's performance of the award (including the current transition activities) could result in "major delays" in the provision of TMIT services.  App. 566 (Burns Decl. ¶ 13).  The resulting gap in services would "negatively impact the ability to improve weapons proficiency and lethality" on moving targets.  App. 568 (Burns Decl. ¶ 14).  Further, to fill that gap, the Corps likely would be forced to pursue multiple independent, regional TMIT contracts, which would "interfere with the standardization of training" across the Corps.  App. 566 (Burns Decl. ¶ 13).  The Corps sought a single-award contract specifically because the standardization of training would reduce the "inherent danger" associated

with "complex live fire and maneuver training." *Id.* (Burns Decl. ¶ 13(a)). The Corps generally seeks to "establish unity of command and strict centralized control" over its range safety operating procedures, and preventing the transition to a centralized single-award contract will impede the Corps' pursuit of that goal. *Id.* (Burns Decl. ¶ 13(b)).

Plaintiff has provided no evidence to question the Government's assertion that an injunction would result in an imminent gap in TMIT services and the patchwork provision of those services by different providers across different geographic areas, both of which would increase the risks and reduce the effectiveness of the Corps' live-fire training. Plaintiff's argument instead boils down to an assertion that it is "positioned to continue performance." ECF No. 34 at 25. Accordingly, the Court affords due deference to the Marine Corps' harm allegations and finds them sufficiently serious to justify a finding that Plaintiff's harms are heavily outweighed by the Government's harms.

Further, given its determination that Plaintiff is unlikely to succeed on its disqualification challenge, the Court further finds that the appearance of impropriety resulting from Plaintiff's improper retention of protected material supports a finding that the public interest favors denying Plaintiff's request for preliminary injunctive relief. Plaintiff correctly argues that protecting the integrity of the procurement process benefits the public. *See SAI Indus. Corp. v. United States*, 60 Fed. Cl. 731, 747 (2004). But in this case, that general rule cuts against Plaintiff. Public confidence in the procurement process is preserved when the Government acts to ensure that its procurement processes remain fair and untainted by allegations of unfair access to information or a lack of honesty and transparency. *See Glob. K9 Prot. Grp., LLC v. United States*, 169 Fed. Cl. 116, 154–55 (2023). In sum, Plaintiff fails to show that the public interest favors awarding preliminary injunctive relief.

### III.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction (ECF No. 5) is

**DENIED**.

   **SO ORDERED.**

Dated: March 13, 2025                    */s/ Kathryn C. Davis*
                                         KATHRYN C. DAVIS
                                         Judge