<p style="text-align:center;color:red;">CORRECTED</p>

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| MARATHON TARGETS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 25-121 |
| | ) | |
| v. | ) | Filed: November 10, 2025 |
| | ) | |
| THE UNITED STATES, | ) | Re-issued: November 24, 2025* |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MVP ROBOTICS, INC., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

## OPINION AND ORDER

In this post-award bid protest, Plaintiff Marathon Targets, Inc. ("Plaintiff") asks that the Court permanently enjoin (1) the performance of a single-award, fixed-price Indefinite Delivery/Indefinite Quantity ("IDIQ") contract awarded by the United States Marine Corps ("Marine Corps" or "Corps") for Trackless Mobile Infantry Targets ("TMITs") system support services to Defendant-Intervenor MVP Robotics, Inc. ("MVP"), and (2) the Marine Corps' post-award decision to disqualify Plaintiff from the present procurement. Plaintiff raises a wide variety of claims. None are successful. Accordingly, Plaintiff's Motion for Judgment on the

---

\* The Court issued this opinion under seal on November 10, 2025, and directed the parties to file any proposed redactions by November 17, 2025. The opinion issued today incorporates the redactions jointly proposed by Plaintiff and Defendant-Intervenor. The Government took no position on Plaintiff and Defendant-Intervenor's proposed redactions. Upon review, the Court finds that the material identified warrants protection from public disclosure, as provided in the applicable Protective Order (ECF No. 15). Redacted material is represented by bracketed ellipses "[ . . . ]."

Administrative Record is **DENIED**.  The Government's Cross-Motion for Judgment on the Administrative Record is **GRANTED**.  MVP's Motion to Dismiss is **DENIED AS MOOT**, and its Cross-Motion for Judgment on the Administrative Record is **GRANTED**.

## I.    BACKGROUND

### A.    The Solicitation and Award

This bid protest concerns Solicitation No. M6785424R8000 ("the Solicitation") for the procurement of TMIT system support services.  Admin. R. ("AR") 574–77, 691, ECF Nos. 35, 39, 45.[1]  The Solicitation was set aside for small businesses.  AR 673.  TMITs are robots which, together with the associated support services acquired under the Solicitation, provide "the Fleet Marine Forces with a dynamic and realistic representation of human targets for use in live-fire / non-live-fire training to increase lethality and unit readiness."  AR 713.  The Marine Corps issued the Solicitation on February 21, 2024.  *See* AR 574.  It indicated that the Corps would award a five-year firm-fixed price IDIQ small-business contract beginning on November 26, 2024.  *See* AR 614, 713.  After amendment of the Solicitation, proposals were due by April 15, 2024.  AR 985, 1366.

The Solicitation indicated that the Corps would assess proposals using three criteria that represented "critical areas of performance most important to [the] Government": (1) Technical

---

[1]  On February 14, 2025, the Government submitted the Administrative Record electronically through the Justice Enterprise File Sharing system.  *See* Gov't's Notice of Filing Admin. R. at 1, ECF No. 35.  The Government filed a corrected Notice on February 20, 2025, *see* Gov't's Corrected Notice of Filing Admin. R. at 1, ECF No. 39, and provided additional documents as part of the Administrative Record on March 11, 2025, *see* Gov't's Notice of Completing Admin. R., ECF No. 45.  Citations to the Administrative Record refer to the bates-labeled page numbers included in the electronic submission.  Pursuant to the Court's Scheduling Order (ECF No. 16), the parties also submitted a Joint Appendix ("JA") on April 4, 2025.  *See* ECF No. 56-2.

Approach, (2) Past Performance, and (3) Price.  AR 1599.  The Corps indicated that an offeror's Technical Approach would be considered "more important" than its Past Performance rating.  *See id.*  As a best-value procurement, the Corps considered "[a]ll evaluation factors other than cost or price, when combined," to be "significantly more important than cost or price."  *Id.*  Because it would make discretionary tradeoff judgments, the Corps cautioned that it could award the contract "to someone other than the highest rated or the lowest-priced offeror."  *Id.*  But the Corps noted that it would not "make an award at a significantly higher price to achieve only slightly superior performance capability."  *Id.*

The Solicitation required offerors to submit proposals containing four sections outlining each offeror's Technical Approach proposal, including (1) a "Staffing Plan," (2) a "Staffing Plan Narrative," (3) "Labor Category Descriptions," and (4) a "Material Technical Approach."  AR 1591.  Each Staffing Plan had to include a description of the offeror's "approach to personnel staffing" in support of 13 TMIT trailers across six TMIT locations and the number of labor hours allocated to satisfy TMIT requirements for each relevant labor category.  *See id.*  Staffing Plan Narratives were to include descriptions of how each offeror's Plan would "provide sufficient resources to perform every requirement."  *Id.*  Labor Category Descriptions covered definitions of each offeror's labor roles and associated labor categories, both for the offeror and any proposed subcontractors.  *See id.*  Offerors needed to address roles and responsibilities, knowledge and certification requirements, education requirements, and years of relevant work experience for their identified roles and labor categories.  AR 1592.  Finally, offerors were required to describe their Material Technical Approach, in which they needed to "prove their understanding [of] the technical requirements and that they possess the resources and capability" to (1) perform a phase-in plan, (2) attain 90 percent "Operational Availability" of 13 TMIT trailers, (3) perform "After

3

Action Review" and "Automatic Obstacle avoidance" capabilities, as well as (4) meet all safety requirements. *Id.* The Corps would assess each offeror's Technical Approach along a five-point rating scale from highest to lowest: Outstanding, Good, Acceptable, Marginal, and Unacceptable. *See* AR 1601.

> To assess the Past Performance factor, the Corps required offerors to submit
>
> a minimum of three, and maximum of five, recent and relevant efforts it performed as the prime, team member of a joint venture or a first-tier subcontractor, preferably with the [Department of Defense] or another federal agency, and preferably performing services of the same nature as the services required by th[e] solicitation.

AR 1592. "Recent" efforts, per the Solicitation, were those engagements lasting at least 12 months that occurred within the three years preceding the Solicitation's due date. *Id.* To determine whether an effort was "relevant," the Corps would assess the "degree of similarity between the reported effort and the solicited effort," considering the effort's scope, magnitude, and complexity. AR 1603. The Corps would further consider customer data from past efforts—like contract reports and written responses—to assess the "quality" of the offeror's performance on those past efforts. *Id.* The Corps indicated it would weigh these considerations to determine a confidence rating that it would assign to each offeror's Past Performance assessment, also on a five-point rating scale from highest to lowest: Substantial Confidence, Satisfactory Confidence, Neutral Confidence, Limited Confidence, and No Confidence. *See* AR 1604.

The final factor—Price—received no adjectival rating in evaluations, but the Corps noted it would calculate a "Total Evaluated Price" for the "sum of the maximum number of trailers per location at 96 hours for all ordering periods." *Id.* The Solicitation indicated that the contracting officer ("CO") would perform a "price analysis" to determine "fair and reasonable pricing" pursuant to Federal Acquisition Regulation ("FAR") 15.404-1(b). *Id.* The Corps reserved the

right to reject an offer if the proposal lacked "balanced pricing" and posed "an unacceptable risk to the Government." *Id.* It also reserved the right to "perform a price realism analysis for the limited purpose of measuring an offeror's understanding of the requirements or to assess the risk of poor performance inherent in an offeror's proposal." AR 1605. "An unrealistically low price," the Corps noted, "may indicate the offeror's lack of competence or failure to comprehend the requirements and risks of the solicited effort." *Id.* "Unbalanced pricing exists," the Corps stated, "when, despite an acceptable total evaluated price, the price of one or more contract line items is significantly over or understated, as indicated by the application of price analysis techniques." *Id.*

As relevant to this lawsuit and to the Corps' assessment of each offeror's Staffing Plan, the Solicitation indicated that the Corps expected offerors to perform "an average of 64 hours of training time per calendar week across all locations." AR 730. It also advised that the Corps' scheduling requirements "may require support in a continuous 24-hour period (including weekends and holidays)." *Id.* Although the Corps reasoned that it would be unlikely for "every trailer or installation" to demand up to 96 hours of training support in a week, it created a Contract Line Item Number ("CLIN") structure so that the Corps could order standard 64-hour periods of performance with, essentially, options for additional 32-hour periods of performance if necessary. *See* AR 1949.

Three offerors submitted initial proposals by April 15, 2024, including Plaintiff and MVP. *See* AR 1669, 1724, 1977. Plaintiff, the incumbent contractor, submitted its existing TMIT contract with the Marine Corps as a past performance reference, arguing that its TMIT work—both with the Corps and with other federal military and law-enforcement agencies—made it the logical pick for the Corps' new TMIT contract. *See* AR 1648–50, 1669. Plaintiff initially proposed a price of $[ . . . ] for the entire period of the new contract. AR 1663. MVP, for its part, argued

that its TMIT technology had been proven "from the football field to the battlefield." AR 1726. It proposed performing the TMIT contract as a "partnership" with Corps Solutions, LLC ("Corps Solutions"), who would serve as MVP's subcontractor and would help MVP "provide the Marine Corps with the most capable and cost-effective Training as a Service (TaaS) capability." *Id.* MVP initially proposed a total contract price of $[ . . . ]. AR 1977.

A Source Selection Evaluation Board ("SSEB") rated Plaintiff's initial Technical proposal "Unacceptable" and rated MVP's Technical proposal "Marginal." *Id.* The Source Selection Authority ("SSA"), concurring with those ratings, noted that none of the offerors' submitted Staffing Plans fully met the Solicitation's requirements and that only MVP adequately addressed how it would staff the "32 additional hours of performance at each site" above the requirements in the incumbent contract. AR 1978. Although none of the proposals were awardable, the SSA determined that Plaintiff's and MVP's "significant weakness(es)/deficiencies" appeared "correctable through discussions," and recommended including those firms in the competitive range for offers. AR 1979. Accordingly, the Corps entered discussions with Plaintiff and MVP, both of which submitted final proposal revisions by September 6, 2024. *See* AR 2332, 2551. Plaintiff's revised proposal increased its proposed price to $[ . . . ]. AR 2546. MVP's revised proposal increased its price slightly to $190,705,603.02. AR 2620. Even after revision, both prices fell below the Government's approved contract ceiling of $226,400,000. *See* AR 2843.

After evaluation of the final revised proposals, the SSEB and SSA rated Plaintiff's Technical Approach as "Acceptable." AR 2841. The Technical Evaluation Team ("TET") found that Plaintiff's Technical Approach had three strengths and four weaknesses. *See* AR 2662. The TET noted that Plaintiff's proposed Staffing Plan demonstrated an adequate understanding of labor categories, but it also found that Plaintiff's proposal did not fully account for the time needed to

complete multiple different tasks outlined in the Solicitation. *See* AR 2662–63. The TET found that Plaintiff's proposal demonstrated an awareness of staffing complexities, but it also found that the proposal lacked "detailed proposal narratives" to describe its processes, which suggested an increased "risk of degradation of performance." AR 2663–64. Per the TET, Plaintiff further failed to demonstrate an understanding of the roles and responsibilities for certain key personnel necessary for implementation of the contract. *See* AR 2665–66. Finally, the TET found Plaintiff's Technical Approach failed to explain how certain over-the-air updates—a feature that Plaintiff proposed, even though the Solicitation did not require it—would be performed and aligned with the Corps' security requirements. *See* AR 2666.

The Past Performance Evaluation Team ("PPET") recommended that Plaintiff receive a "Satisfactory Confidence" past performance rating in large part because of Plaintiff's successful performance of the incumbent TMIT contract. *See* AR 2657–59.

On Price, the Corps' analysis of Plaintiff's proposal indicated a "moderate risk" of unsuccessful performance should the Corps require the additional 32-hour trailers. AR 2681. It found that Plaintiff's "price for the additional 32 hour CLIN is exceptionally low when compared to the similar performance required of the offeror for the 64 hour CLINs," indicating to the Corps that Plaintiff was "gambling on what performance the Government will actually order during the performance periods." AR 2680–81. By submitting a proposal with "substantially" lower cost estimates for the additional 32-hour trailers, Plaintiff was able to achieve a significant overall price advantage compared to MVP. *See* AR 2681. But Plaintiff's proposed price for the primary, requisite 64-hour trailers was [ . . . ] for those same trailers. *See id.* The Corps indicated that Plaintiff's estimates reflected "intentional business decisions to adjust [Plaintiff's] risk through the unbalanced CLIN pricing," *i.e.*, by making a bet that the Corps would not need to order very many

32-hour trailers. *Id.* While the risk posed by that strategy to the Government was not "unacceptable," the Corps noted that "[i]f the Government were to frequently order the additional 32 hour CLINs it would force [Plaintiff] to potentially perform at a loss." *Id.* The risk that Plaintiff would operate at a loss, which might result in Plaintiff's failure to fulfill the requirements of the contract, led the Corps to conclude that Plaintiff's pricing represented a "significant," negative "trade-off consideration." *Id.*

The SSEB and SSA rated MVP's Technical Approach as "Good," one step higher than Plaintiff. AR 2841. The TET identified eight strengths and did not explicitly identify any weaknesses in MVP's proposal. AR 2669–72. The TET credited MVP's (1) stated focus on retaining staff, which demonstrated a "commitment to workforce stability," AR 2670; (2) choice to provide each site location with [ . . . ] employees, *id.*; (3) commitment to deliver materials to worksites [ . . . ] prior to the contract service date, AR 2671; (4) description of its maintenance strategy, which incorporated a "maintenance planning factor" to maintain [ . . . ] operational availability, *id.*; (5) plan to [ . . . ] all TMITs with [ . . . ] by the end of the [ . . . ] year of the contract, *id.*; (6) TMIT [ . . . ], which would enable the Corps to show [ . . . ] that is "unique to live-fire training," AR 2671–72; (7) automatic obstacle avoidance capability, which enabled TMITs to avoid [ . . . ]-inch obstacles without human intervention, AR 2672; and (8) stated ability to control "[ . . . ] systems simultaneously from one device," *id.*

The PPET recommended a "Neutral Confidence" rating for MVP's past performance, indicating that because only two past performance efforts were recent and, at best, somewhat relevant—and because there were no contractor performance reports available to evaluate performance—the Marine Corps could make no assessment, be it positive or negative, about

whether MVP's past performance suggested it could successfully perform the Solicitation's requirements.  AR 2651–54.

On Price, MVP proposed a final price that was approximately 14 percent higher than Plaintiff's proposal and 18 percent lower than the Government's approved contract ceiling.  AR 2681–82.  The Corps' pricing analysis confirmed that MVP's proposed price for the 32-hour optional trailers aligned with the pricing for the required 64-hour trailers, unlike Plaintiff's proposed pricing.  AR 2680–81.  The analysis also identified "[s]ome risk" in MVP's proposed 32-hour trailer pricing, as [ . . . ].  AR 2682.  But the Corps concluded that the identified risk was [ . . . ].  *Id.*

The SSA concurred with the evaluation ratings for each offeror.  *See* AR 2841.  The SSA then conducted a best-value tradeoff analysis, concluding that MVP should be awarded the contract for TMIT services.  AR 2846–47.  The SSA agreed that MVP's Technical Approach should be rated higher than Plaintiff's; in his view, "MVP Robotics ha[d] additional advantages over [Plaintiff] and lack[ed] the additional risks identified in [Plaintiff's] proposal."  AR 2845.  The SSA credited MVP's plan to [ . . . ] the TMIT systems, include [ . . . ] capabilities, and [ . . . ] than in Plaintiff's proposal.  *See id.*  The SSA also noted certain risks in Plaintiff's proposal—for instance, an "inconsistent" Staffing Plan Narrative that had unreasonable projections for staffing hours, *see* AR 2842—and concluded that Plaintiff's Technical proposal contained more risks relative to MVP's.  AR 2845.  Because "the Technical Approach [was] the most important factor and MVP Robotics provide[d] distinct advantages over [Plaintiff] and [was] more highly rated," the SSA found "that this [was] a distinguishing factor."  *Id.*

The SSA concluded that both offerors were "awardable" under the Past Performance factor.  *Id.*  The SSA noted Plaintiff's previous relevant experience and favorable performance reviews.

*See id.* The SSA further noted that MVP had not provided performance reviews but did provide "Exceptional" or "Very Good" reviews for its subcontractor, Corps Solutions. *Id.* The SSA found "no basis to discriminate between" the offerors on this factor "because MVP Robotics may not be evaluated favorably or unfavorably" for past performance and Plaintiff had "a reasonable expectation of successful performance." *Id.* Given that, the SSA did "not find this to be a distinguishing factor for award." *Id.*

Finally, the SSA confirmed that Plaintiff's proposed price at least facially provided Plaintiff with an advantage, considering it fell about $26 million below MVP's proposal. *See* AR 2846. But the SSA noted that Plaintiff's "unbalanced pricing of the 32 hour trailers raises a significant concern if additional hours are ordered." *Id.* Further, Plaintiff "attempt[ed] to explain that efficiencies with 64 hour trailers [could] be applied to 32 hour trailers but fail[ed] to provide supporting documentation in the staffing plan narrative." *Id.* The SSA noted that the Corps provided Plaintiff an opportunity to further substantiate its pricing on the 32-hour trailers, but Plaintiff declined to do so, indicating that it believed the Corps was unlikely to purchase many 32-hour options. *See id.* Thus, the SSA "concur[red] with the [SSAC's pricing analysis] that this demonstrate[d] that [Plaintiff was] making a business decision to propose a lower total evaluated price and that it [was] a risk to the Government whenever 32 hour trailers are ordered." *Id.* The SSA concluded that, "[w]hen coupled with the fact that MVP Robotics [ . . . ] for 64 hour trailers and balanced pricing across the proposal . . . MVP Robotics contains less risk to the Government, and it [was] worth paying the price premium." *Id.*

Because MVP had the higher-rated Technical proposal, provided "additional advantages to the Government," and had "less risk" than Plaintiff, the SSA awarded the TMIT contract to

MVP.  *See* AR 2846–47.  The Corps notified offerors of the award on November 27, 2024.  *See* AR 3147.

**B.    Inadvertent Disclosure of Sensitive Information and Ensuing Investigation**

In communicating the award decision to Plaintiff's CEO, Dr. Alex Brooks, the Marine Corps' CO inadvertently attached to its email a partially unredacted copy of the TET's evaluation of MVP's Technical proposal.  *See* AR 3536.  That inadvertent disclosure set off a series of events.  Dr. Brooks apparently disclosed that information—which the Corps considered to be "source selection" information that is protected from disclosure under FAR 3.104-4—to 10 other people, including some of Plaintiff's employees and two people not employed by Plaintiff at the time.  *See* AR 3538–39; *see also* AR 3645.  Dr. Brooks then attempted to justify further use of the protected information by arguing that he and other employees of Plaintiff had independent knowledge of certain aspects of the inadvertently disclosed information.  *See* AR 3659 (Second Decl. of Dr. Brooks).  Specifically, Dr. Brooks claimed that he learned the identity of MVP's subcontractor (Corps Solutions) through non-protected sources—an MVP press release and Plaintiff's employees who work with the subcontractor.  *See* AR 3659.

As Plaintiff concedes, Dr. Brooks made a "serious mistake."  Pl.'s Mot. for J. on Admin. R. at 22, ECF No. 41.  After investigating the disclosure, the Corps found that neither alternative source of information could have possibly supported Dr. Brooks' assertion, as the evidence Dr. Brooks identified did not exist at the time Plaintiff made its initial challenge to the contract award.  *See* AR 3463–64.  Per the Corps, Dr. Brooks had "clearly manufactured" the evidence to support his company's use of the protected information to challenge the TMIT award.  *See* AR 3464.  Based in part on this misrepresentation and the appearance of impropriety caused by Plaintiff's

11

conduct, the Corps disqualified Plaintiff (post-award) from participating in the Solicitation.  *See* AR 3473–79, 3485.

Much of the factual background relevant to the inadvertent disclosure and Plaintiff's disqualification is summarized in the Court's prior opinion and order denying Plaintiff's request for a preliminary injunction.  *See Marathon Targets, Inc. v. United States* (*Marathon I*), 175 Fed. Cl. 725, 731–33 (2025).  The only additional information Plaintiff provides in its First Amended Complaint and merits briefing relates to what it alleges is the actual source of Dr. Brooks' independent knowledge of MVP's subcontractor.  Per Plaintiff, on or about March 8, 2024, one of Plaintiff's employees became aware of a LinkedIn post that MVP's subcontractor—Corps Solutions—issued seeking job applications for TMIT positions.  *See* Pl.'s First Am. Compl. ¶¶ 9–10, ECF No. 40.  That post indicated that Corps Solutions was "proud to partner with MVP Robotics, Inc. for this exciting opportunity."  *Id.* ¶ 9.  It indicated nothing further about the nature of the partnership.  *See id.*  The employee circulated an internal email on March 9, 2024, attaching a screenshot of the LinkedIn Post.  *Id.* ¶ 10.  On March 11, 2024, the employee sent a second internal email, notifying coworkers that multiple competitors were expected to bid for the successor contract to Plaintiff's incumbent TMIT contract—including MVP, which would be "partnering with Corps Solutions."  *Id.* ¶ 11.  The employee noted that Corps Solutions had "posted job ads in order to substantiate their proposal" for the Solicitation at issue.  *Id.*

## C.   Procedural History

On December 2, 2024, Plaintiff filed a size protest with the Corps.  AR 3300.  In that protest, Plaintiff alleged that MVP did not qualify as a small business under the Small Business Administration's ("SBA") common-stock-ownership rules.  *See* AR 3305.  It further claimed that MVP did not satisfy the contract's small-business requirements because its subcontractor, Corps

Solutions, similarly did not qualify as small and would, in Plaintiff's view, likely be performing primary and vital parts of the TMIT contract. *See* AR 3308–11. The Corps forwarded the size protest to the SBA on December 3, 2024. AR 3301.

On the same day it filed the size protest, Dr. Brooks sent the Corps a list of debriefing questions and a declaration alleging that Corps Solutions, as MVP's proposed subcontractor on the new TMIT contract, had given MVP an unfair advantage because Corps Solutions was then providing range support services at locations where Plaintiff operated its TMITs under the incumbent contract. *See* AR 3275–82, 3285. Plaintiff further argued that Corps Solutions had an impaired objectivity organizational conflict of interest ("OCI"), which should be imputed to MVP, because Corps Solutions' performance of the separate range support contract would put it in a position to assess its own performance on the new TMIT contract. *See* AR 3283–85.

On December 3, 2024, the Corps responded to five of Plaintiff's debriefing questions. *See* AR 3298–99.[2] In the same communication, the Corps informed Plaintiff it was opening an investigation into the inadvertent disclosure of sensitive information, including protected source selection information. AR 3288. That investigation continued until January 16, 2025, when the Corps finalized its decision to disqualify Plaintiff from the Solicitation. *Marathon I*, 175 Fed. Cl. at 733. On January 17, 2025, the day after the Corps disqualified Plaintiff, the SBA dismissed Plaintiff's size protest for lack of standing given that Plaintiff had been eliminated from

---

[2] Plaintiff also filed an agency-level protest objecting to the Corps limiting each offeror to five debriefing questions. *See* AR 3286–87. The bases for Plaintiff's agency-level protest are distinct from its challenge before this Court. *Cf.* ECF No. 41 ¶ 68 n.2 (arguing that "[t]he failure of the Contracting Officer to address Marathon's debriefing question [of] whether she complied with FAR § 9.504(a)(i) is a tactic [sic] admission that she never complied with her duties").

consideration for the contract at issue. *See* AR 3317. Plaintiff did not receive notice of that dismissal until January 21, 2025. *See* AR 3420.

On January 8, 2025, while the investigation was ongoing, the Corps' CO determined that there was no evidence that MVP possessed an unfair advantage in the procurement from its relationship with Corps Solutions or that MVP had misappropriated Plaintiff's trade secrets. *See* AR 3451–52. The CO found Dr. Brooks' claim of an impaired objectivity OCI to be "marginally valid, but easily mitigatable" by having the Marine Corps, rather than Corps Solutions, conduct inspections of its performance of the new TMIT contract. AR 3452–53. On January 21, 2025, the same day it was notified of the size protest dismissal, Plaintiff filed its Complaint and Motion for a Preliminary Injunction in this Court. *See* Pl.'s Compl., ECF No. 1; Pl.'s Mot. for Prelim. Inj., ECF No. 5. On February 4, 2025, roughly two weeks after Plaintiff filed its protest in this Court, the CO determined that there was no basis to conclude that MVP would fail to comply with FAR 52.219-14's limitation on subcontracting while performing the new TMIT contract. AR 3734. Because MVP's material cost was, in one location, roughly triple Corps Solutions' labor cost, the Corps found no merit to Plaintiff's allegation that MVP would violate the FAR's limitation on subcontracting rule. *See id.*

The Court denied Plaintiff's preliminary injunction motion on March 13, 2025, finding that Plaintiff had not met its burden on any of the preliminary injunction factors. *See Marathon I*, 175 Fed. Cl. at 734–48. On the likelihood of success factor, the Court determined that Plaintiff was unlikely to show that the Corps improperly disqualified it from the Solicitation, meaning it was unlikely Plaintiff had standing as an interested party to challenge the TMIT contract award. *See id.* at 735–36. More specifically, the Court concluded that the Corps did not likely (1) fail to comply with all relevant procedural requirements in its investigation and disqualification or (2) act

14

in an arbitrary and capricious manner by finding Plaintiff's conduct demonstrated an appearance of impropriety. *See id.* at 736–37, 741–42.

Pursuant to the Court's Scheduling Order (ECF No. 16), Plaintiff filed its First Amended Complaint on February 28, 2025.[3]  *See* ECF No. 40.  It filed a Motion for Judgment on the Administrative Record on the same day.  *See* ECF No. 41.  The Government and MVP cross-moved and responded on March 14, 2025.  *See* Def.-Intervenor's Mot. to Dismiss & Cross-Mot. for J. on Admin. R., ECF No. 49;[4] Gov't's Cross-Mot. for J. on Admin. R., ECF No. 50.  Plaintiff responded on March 21, 2025.  *See* Pl.'s Resp. & Reply, ECF No. 52.  The Government and MVP filed their replies on March 28, 2025.  *See* Def.-Intervenor's Reply, ECF No. 54; Gov't's Reply, ECF No. 55.  The Court held oral argument on April 29, 2025.  The parties' Motions are now ripe for resolution.

---

[3] MVP coupled its opposition to Plaintiff's preliminary injunction request with a Motion to Dismiss.  *See* Def.-Intervenor's Mot. to Dismiss & Resp. in Opp'n to Pl.'s Mot. for Prelim. Inj., ECF No. 31.  Because Plaintiff subsequently amended the Complaint, the Court denies MVP's first Motion to Dismiss as moot.  *See JRS Mgmt. v. Lynch*, 621 F. App'x 978, 982 (Fed. Cir. 2015) ("[O]nce the Board authorized [the plaintiff] to file an amended complaint, the motion to dismiss the original complaint, which had been superseded, was rendered moot.").

[4] MVP simultaneously moved under Rule 12(b)(6) to dismiss Plaintiff's First Amended Complaint for lack of interested party standing or, alternatively, to dismiss certain counts for failure to state a claim.  *See* ECF No. 49 at 16–27.  However, since the Court has a full administrative record and merits briefing that raises the same arguments, in the interests of judicial economy and finality, the Court will proceed directly to the merits on the parties' motions for judgment on the administrative record.  *See Young v. United States*, 497 F. App'x 53, 58 n.7 (Fed. Cir. 2012) (treating decision as judgment on the administrative record, rather than under Rule 12(b)(6) where the decision was based, in part, on the administrative record).  MVP's alternative request for dismissal is therefore denied as moot.

## II.  LEGAL STANDARDS

### A.    Motion for Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("RCFC") governs motions for judgment on the administrative record.  Deciding such motions compares to an "expedited trial on the record."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  The standard in such cases is "narrower" than at the summary judgment stage; it asks, "given all the disputed and undisputed facts in the administrative record, whether the plaintiff has met the burden of proof to show that the [agency's] decision was not in accordance with the law."  *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007) (citing *Bannum*, 404 F.3d at 1357).  Thus, unlike the summary judgment standard, a genuine dispute of material fact does not prevent the Court from granting a motion for judgment on the administrative record.  *See Bannum*, 404 F.3d at 1357; *Martinez*, 77 Fed. Cl. at 324.

### B.    Bid Protest Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, confers on this Court "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  The Tucker Act requires that the Court review agency procurement actions "pursuant to the standards set forth" in the Administrative Procedure Act ("APA").  *Id.* § 1491(b)(4); *see Banknote Corp. of Am. v. United States (Banknote I)*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Under the APA standard of review, the Court asks whether an agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 & n.5 (Fed. Cir. 2001).  To satisfy the

"arbitrary and capricious" standard, an agency must "articulate a satisfactory explanation" for its decision that includes "a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 42–43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *see Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (holding that agency action is rational where the agency "provided a coherent and reasonable explanation of its exercise of discretion").  A procuring agency's action "may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332.

This Court affords no deference to an agency's legal determinations, *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391–92 (2024), but otherwise, "contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process," *Impresa*, 238 F.3d at 1332 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)).  When a contracting officer makes a reasonable decision within the scope of the broad discretion afforded to such officers, the Court "may not substitute its judgment for that of the agency."  *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1311 (Fed. Cir. 2021) (quoting *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003)).  As a result, protestors have a "heavy burden" to overcome the presumption of regularity that the Court gives to agency decisions.  *Impresa*, 238 F.3d at 1338.

To succeed in a bid protest, a plaintiff also "must show a significant, prejudicial error in the procurement process."  *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); *see also* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error.").

A protestor establishes prejudice by showing "that there was a substantial chance it would have received the contract award but for [the agency's] error." *Alfa Laval*, 175 F.3d at 1367 (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).

## III.   DISCUSSION

Plaintiff's protest seeks redress for two procurement actions by the Marine Corps: (1) the Corps' choice to award the TMIT contract to MVP, and (2) its later decision to disqualify Plaintiff from participation in the Solicitation.  To prevail in this bid protest, Plaintiff must show both that the Corps' evaluation and award to MVP, as well as its decision to disqualify Plaintiff, were arbitrary and capricious, an abuse of discretion, or not in accordance with the law.  It fails in making either showing.

### A.   The Marine Corps' Disqualification of Plaintiff Was Not Arbitrary and Capricious or Contrary to Law.

Taking the issues in reverse order, the Corps provided three independent justifications for disqualifying Plaintiff: (1) Plaintiff's retention and use of protected information created a conflict of interest and gave Plaintiff an unfair competitive advantage; (2) Plaintiff's conduct created an appearance of impropriety by improperly retaining and using the protected information and by making misrepresentations to justify its continued retention and use of the information; and (3) Plaintiff demonstrated it was not a responsible contractor under the FAR.  AR 3485; *see also* AR 3473–79.  Plaintiff argues, among other things, that the Corps decision was arbitrary, capricious, and contrary to law because (a) the Corps effectively made a small-business responsibility determination without referring the question to the SBA as it was required by law, *see* ECF No. 41 at 28–31; (b) the investigation and disqualification failed to afford Plaintiff sufficient due process, *see id.* at 31–32; (c) Plaintiff did not possess any OCIs, *see id.* at 32–34;

18

and (d) the Corps violated the First Amendment by punishing Plaintiff for "protected activity," *id.* at 26–27.  The Court finds that the Corps' disqualification of Plaintiff was substantively reasonable and procedurally proper.  Since the Court finds no error in the disqualification decision, Plaintiff does not have standing to pursue this protest.

  1. <u>Legal Standards Governing Disqualification of Offerors</u>

    To have standing in a bid protest as an interested party within the meaning of the Tucker Act, a protestor must have a "direct economic interest" in a solicitation, meaning it must have had a "'substantial chance' of receiving the contract."  *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006) (quoting *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002)).  A valid disqualification from participating in a procurement, even in a post-award posture, eliminates an offeror's eligibility for the contract.  *See Raytheon Co. v. United States*, 170 Fed. Cl. 561, 583–84 (2024); *NKF Eng'g, Inc. v. United States*, 805 F.2d 372, 376–77 (Fed. Cir. 1986); *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1360 (Fed. Cir. 2015) ("[T]he question of standing hinges on whether [Plaintiff] could compete for a reopened bid if it wins its protest of the initial contract award.").

    Courts apply the APA's arbitrary-and-capricious standard to review a procuring agency's decision to exclude an offeror from competing for an award due to the appearance of impropriety. *See Raytheon*, 170 Fed. Cl. at 583–85; *NKF Eng'g*, 805 F.2d at 376, 378; *SAGAM Securite Senegal v. United States*, No. 2021-2279, 2023 WL 6632915, at *8–9 (Fed. Cir. Oct. 12, 2023).  That means a court may set aside a disqualification only if the disqualification decision lacked a rational basis. While disqualification on the basis of a potential OCI cannot rely "on mere suspicion and innuendo," the agency need only point to "hard facts" indicating the potential existence of an impropriety to satisfy rational-basis review.  *Turner Constr. Co. v. United States*, 645 F.3d 1377,

1385–87 (Fed. Cir. 2011).  The agency need not establish that an actual OCI exists; merely the appearance of an OCI is a sufficient basis to disqualify an offeror.  *Id.* at 1387.  The FAR provides substantive guidance on a contracting officer's responsibilities to promote the integrity of the procurement system—guidance that governs how this Court assesses disqualification decisions. *See, e.g.*, FAR 3.000 ("This part prescribes policies and procedures for avoiding improper business practices and personal conflicts of interest and for dealing with their apparent or actual occurrence."); FAR 3.101-1 ("The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships."); FAR 9.504(a)(2) ("contracting officers shall . . . "[a]void, neutralize, or mitigate significant potential conflicts before contract award"); *see also Raytheon*, 170 Fed. Cl. at 581–82.

Procedurally, disqualifications—like any informal agency adjudication, *see* 5 U.S.C. § 555(b)—must afford the entity facing disqualification certain "rudimentary" procedural protections.  *Sys. Plus, Inc. v. United States*, 69 Fed. Cl. 757, 767 (2006); *see also Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 655 (1990).  For example, under the APA, parties are "entitled to appear in person or by or with counsel or other duly qualified representative in an agency proceeding."  5 U.S.C. § 555(b).  Additionally, procedural due-process protections require that the party have an "opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

2.    <u>The Corps' Finding that Plaintiff's Actions Created the Appearance of Impropriety Was Not Arbitrary, Capricious, or Contrary to Law.</u>

Plaintiff devotes much of its merits briefing on the substantive grounds for the Corps' disqualification decision to arguing that it did not actually possess any OCI and that the Corps

erred by, in substance, making a responsibility determination that should have been reserved for the SBA. *See* ECF No. 41 at 28–31, 32–34; ECF No. 52 at 7–16. As MVP argues in reply, Plaintiff devotes little—if any—argument to disputing the Corps' determination that Plaintiff's actions created an appearance of impropriety, which was an independent basis of the Corps' disqualification decision. *See* ECF No. 54 at 7–9; *see also* ECF No. 41 at 28–34; ECF No. 52 at 7–19.

Since the Court's preliminary injunction opinion, Plaintiff has provided no new reason to question the Corps' determination that Plaintiff's actions created an appearance of impropriety that might threaten the integrity of the procurement process. *See Marathon I*, 175 Fed. Cl. at 741–44. As this Court previously explained, and as other judges of this Court and the United States Court of Appeals for the Federal Circuit have explained, an "agency's conclusion that 'an appearance of impropriety existed' can alone justify disqualification of a prospective offeror." *Id.* at 741 (quoting *NKF Eng'g*, 805 F.2d at 376–77). The facts available to the agency "do not need to show an actual conflict—a potential conflict can be sufficient." *Turner Constr.*, 645 F.3d at 1387.

Plaintiff makes several fact-specific arguments in an attempt to distinguish this Court's and the Federal Circuit's caselaw on disqualification, arguing that those cases involved the potential transfer of sensitive information through employees transitioning between employers and that the disqualifications occurred before the award of each contract. *See* ECF No. 52 at 11–16. But the very nature of the APA's deferential standard requires this Court to look past hyper-specific factual distinctions to determine whether the Corps' disqualification decision as a whole was reasonable and based on a coherent explanation connecting hard facts to a rational conclusion. *See Raytheon*, 170 Fed. Cl. at 583. Indeed, "the Federal Circuit's *NKF* decision is replete with language suggesting that [a contracting officer] has wide latitude to make a finding of the appearance of

21

impropriety and to exclude an offeror on that basis; as long as such a finding is rational, this Court must uphold it." *Id.*

The hard facts that the Corps identified in this case are not so different from those in the cases Plaintiff attempts to distinguish. Plaintiff, a direct competitor of MVP, disseminated to its employees (and, apparently, to two non-employees outside the company) protected information about MVP's proprietary products and services and repeatedly attempted to justify its attempts to use such information in a manner inconsistent with the rules governing procurements. *See* AR 3455–3458, 3461–63. Additionally, Plaintiff's decision to misrepresent evidence of its independent knowledge, thus concealing any actual basis of knowledge that Plaintiff may have had, AR 3463–64, supports the Corps' conclusion that Plaintiff's actions might tend to have a negative effect on the public perception of the procurement process, AR 3485. Setting aside the question of whether Plaintiff *actually* possessed a conflict of interest based on its handling of the protected information, which, as the cases make clear, is not required to disqualify an offeror, the Corps was well within its substantial discretion to determine that such facts presented the *appearance* of impropriety. *See NKF Eng'g*, 805 F.2d at 376; *Raytheon*, 170 Fed. Cl. at 582–83.

To the extent that Plaintiff challenges the Corps' finding of an appearance of impropriety as being based solely on a determination that Plaintiff lacked responsibility, a determination that arguably can be made only by the SBA, its argument is squarely foreclosed by the Federal Circuit's decision in *NKF Engineering*. There, the plaintiff made the same argument. It contended "that the disqualification decision is, in essence, a determination that NKF lacked 'integrity' and was not 'responsible' to be awarded the contract due to its alleged receipt of inside information, and hence, the second quoted sentence of [15 U.S.C. § 637(b)(7)(A)] requires SBA involvement." *NKF Eng'g*, 805 F.2d at 378; *see also* ECF No. 41 at 28 (arguing that § 637(b)(7)(A) requires

referral to the SBA for a determination of Plaintiff's responsibility based on a finding of a lack of integrity). As the Federal Circuit explained in *NKF*, "[t]he disqualification here, on the basis of appearance of impropriety, had nothing to do with NKF's status as a small business, or its ability to perform the contract." 805 F.2d at 378. "[I]t did not even relate to NKF's integrity." *Id.* "Rather, it focused on the integrity of the bidding system, and was part of an effort to keep the perception of it pure in the minds of the public." *Id.*; *see also* AR 3475–79 (citing *NKF* for the proposition that a contracting officer is permitted to act to protect the integrity of the bidding process, and determining that Plaintiff created an appearance of impropriety by attempting to "bolster its inappropriate use" of protected information about another bidder).

Here, the Corps was permitted to act to avoid an appearance of impropriety, separate and apart from any determination that the SBA could have made on Plaintiff's responsibility as a contractor. *See NKF Eng'g*, 805 F.2d at 378. And the Corps pointed to "hard facts" to indicate a "potential conflict of interest" that might result from Plaintiff's improper retention and use of protected information. *Turner Constr.*, 645 F.3d at 1387. Thus, the Court defers to the Corps' reasonable and coherent explanation justifying its determination that Plaintiff's conduct created an appearance of impropriety in the procurement. *See Raytheon*, 170 Fed. Cl. at 589; *NKF Eng'g*, 805 F.2d at 376. Accordingly, the Court need not determine whether the Corps' other two grounds for disqualification—that Plaintiff possessed an OCI and that it was not a responsible contractor within the meaning of the FAR—survive APA review.[5]

---

[5] Plaintiff further alleges the Corps effected a de facto debarment by disqualifying Plaintiff from the procurement and communicating that disqualification to the SBA. ECF No. 41 at 32. Under this theory, Plaintiff must "show evidence demonstrating that the agency will not award the contractor future contracts." *MG Altus Apache Co. v. United States*, 111 Fed. Cl. 425, 444 (2013); *see also TLT Constr. Corp. v. United States*, 50 Fed. Cl. 212, 215 (2001) (indicating that a plaintiff "must demonstrate a 'systematic effort by the procuring agency to reject all of the bidder's contract

3.     <u>Plaintiff Fails to Show that the Corps' Investigation Was Procedurally Improper.</u>

Like its challenges to the substantive grounds of the Corps' disqualification decision, Plaintiff's procedural challenge has changed little from the preliminary injunction stage. *See Marathon I*, 175 Fed. Cl. at 736–39. Plaintiff relies on this Court's decision in *Systems Plus, Inc. v. United States*, 69 Fed. Cl. 757 (2006), to assert that the Corps violated Plaintiff's due-process rights by failing to provide adequate notice about the Corps' "true concern" in the disqualification decision—*i.e.*, the "accuracy" of Dr. Brooks' declaration. ECF No. 52 at 17; *see also* ECF No. 41 at 31–32. Plaintiff asserts that the Corps failed to disclose concerns about Dr. Brooks' statements, as distinct from the Corps' concerns about potential Procurement Integrity Act ("PIA") violations and OCIs, meaning that the Corps did not give Plaintiff sufficient notice and an opportunity to respond. *See* ECF No. 52 at 17.

Plaintiff fails to show that the Corps violated its due-process rights. As an initial matter, Plaintiff ignores the fact that the misrepresentations made by Dr. Brooks were made in response to the Corps' notice of its investigation and request for Plaintiff to confirm that it had taken certain measures to mitigate the inadvertent disclosure. *See* AR 3288, 3659. Moreover, Plaintiff presents the Corps' "concerns" about the accuracy of Dr. Brooks' statements as entirely independent of and divorced from the Corps' investigation into potential PIA violations and OCIs. *See* ECF No. 52 at 17–19. As the Court previously found, the record instead reflects that, from the start of the

---

bids'" without following the "applicable debarment procedures" found in the FAR (quoting *Stapp Towing, Inc. v. United States*, 34 Fed. Cl. 300, 312 (1995))). Plaintiff points to no evidence whatsoever suggesting a systematic effort by the Corps to reject all Plaintiff's future bids without undergoing the formal debarment process. Rather, the only evidence relevant to this claim is the Corps' referral of Plaintiff to "the Navy's Acquisition Integrity Office for potential suspension or debarment under FAR 9.407-2." AR 3485. The record thus makes clear the Corps is following debarment procedures, not ignoring them.

investigation, the CO put Plaintiff on notice that the "inadvertent disclosure could create an unfair competitive advantage or impact the acquisition."  AR 3288.  The CO continued: "Specifically, the Agency's inadvertent disclosure of MVP's protected information to [Plaintiff] may give [Plaintiff] an unfair competitive advantage."  *Id.*

Setting aside the question of whether Plaintiff actually possessed an unfair competitive advantage, which the Court does not decide here, this communication sufficed to put Plaintiff on notice that it may be disqualified for an appearance of impropriety.  The Government's responsibility to avoid any appearance of impropriety, per the FAR, is based directly on its responsibility to avoid actual or apparent conflicts of interest.  *See* FAR 3.101-1.  Although such a finding need not conclude there was an actual conflict of interest, it must point to hard facts suggesting that an objective observer might believe there is an impropriety.  *See Raytheon*, 170 Fed. Cl. at 581–82.  Plaintiff's choice to misrepresent evidence to justify its use and retention of MVP's proprietary information, far from being entirely unrelated to the Corps' concerns about unfair competitive advantage, ties directly to the competitive standing that an objective observer might believe Plaintiff sought to gain from the continued possession of that information.  The Corps' initial notice, which the CO sent about six weeks before the Corps' disqualification decision, satisfies the APA's procedural due-process requirements.  *See Marathon I*, 175 Fed. Cl. at 737–39; *Eldridge*, 424 U.S. at 349; *cf. Sys. Plus*, 69 Fed. Cl. at 767 (holding an investigation was unlawful where the CO failed to provide "any notice" or opportunity to be heard).[6]

---

[6] Plaintiff also insists that the record fails to explain why the CO did not recognize that she had attached sensitive materials to the email she sent Dr. Brooks following the award decision. *See* ECF No. 52 at 18–19.  Plaintiff argues that it would not be fair to hold Plaintiff to a "higher level of scrutiny" than the scrutiny that applies to the CO's actions.  *Id.* at 19.  It is unclear to the Court what relevance Plaintiff's argument has.  For one, the Corps found that the CO violated various FAR requirements in sending the attachment to Plaintiff's CEO.  AR 3469–70.  Plaintiff

Even if due process required the Corps to confront Plaintiff about Dr. Brooks' misrepresentations and allow it to provide an explanation, Plaintiff does not demonstrate prejudicial error. Its apparent explanation is that the core assertion by Dr. Brooks—that Plaintiff had knowledge of the identity of MVP's subcontractor from an independent source—was "verifiably true," as one of Plaintiff's employees had apparently deduced that MVP would be partnering with Corps Solutions well before this procurement commenced. *See* ECF No. 40 ¶ 50. As the Court noted in its preliminary injunction opinion and as the Corps found in its disqualification decision, the concerning issue was not whether Plaintiff had independent knowledge. *See Marathon I*, 175 Fed. Cl. at 743 n.8; AR 3463–64. It was instead that Dr. Brooks misrepresented the basis of his knowledge, suggesting that Plaintiff sought to take advantage of the information it inadvertently received by attempting to deceive the Corps. *See* AR 3464, 3473; *see also* AR 3478 ("Marathon refused to comply, instead providing various arguments to bolster its inappropriate use of this information. At the very least, Marathon's actions demonstrate an appearance of impropriety . . . ."). Dr. Brooks did not initially cite this newly provided evidence as the basis of his knowledge about MVP's relationship with Corps Solutions. *See Marathon I*, 175 Fed. Cl. at 732. He cited an MVP press release—which, when Plaintiff first challenged the award, did not exist—and an email from one of Plaintiff's employees, which, likewise, was

---

points to no authority—nor could it—suggesting that an agency's failure to abide by procurement regulations thus excuses an offeror's own failure to do so. For another, the record does include the CO's explanation for the disclosure in the follow-up emails she sent to Dr. Brooks—*i.e.*, the CO inadvertently attached the partially unredacted document to the original email. *See* AR 3288. The investigating officer later came to the same conclusion. *See* AR 3455. In any event, Plaintiff's argument fails to grasp the core basis for the Corps' disqualification. Plaintiff did not merely receive protected information; it used and disseminated the information and made misrepresentations aimed at justifying continued use and dissemination of MVP's proprietary information well past the Corps' notification of the inadvertent disclosure. *See* AR 3485.

solicited and obtained after Plaintiff first objected to the award.  *See id.* at 732, 742–43.  As even Plaintiff concedes, this was a "serious mistake," ECF No. 41 at 22, and it is not explained away by pointing to other evidence.

    4.    <u>Plaintiff Fails to Show that the Corps' Disqualification Decision Punished Plaintiff for Protected Activity.</u>

In its final challenge to the Corps' investigation and disqualification, Plaintiff alleges that the Corps impermissibly punished Plaintiff for exercising its right to "petition the Government for [a] redress of grievances"—*i.e.*, for threatening to file and then actually filing its size protest and this bid protest.  ECF No. 41 at 26 (quoting U.S. Const. amend. I).  To show that the Government impermissibly burdened First Amendment rights, a plaintiff must show that (1) the conduct in question was constitutionally protected and (2) that "this conduct was a 'substantial factor'" in the Government's decision to take the allegedly unlawful action.  *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).  Plaintiff cannot meet the two-part showing.

Although the determination of the scope of the relevant conduct directly informs the analysis of whether that conduct was a substantial factor in the Government's alleged retaliation, Plaintiff fails here no matter how the relevant conduct is defined.  Assuming the conduct was Plaintiff's petitioning the SBA and this Court for redress, which is certainly protected activity, *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011), Plaintiff cannot show that its choice to file protests was a substantial factor in the Corps' disqualification decision.  The disqualification was based on Plaintiff's failure to abide by regulations governing the use of protected material, not Plaintiff's threatened legal action.  *See* AR 3485.  Conversely, if the relevant conduct was instead Plaintiff's improper handling and retention of protected information, which was certainly a substantial factor in the Corps' decision, it is assuredly not protected by the First Amendment.

The record confirms that Plaintiff's threats to pursue legal action were not themselves a substantial factor in the Corps' decision to disqualify Plaintiff from participating in the procurement. Indeed, the Corps complied with its responsibility to facilitate Plaintiff's legal action where it was required to do so: for instance, the Corps forwarded Plaintiff's size protest to the SBA, as directed by the FAR. AR 3301; *see also* AR 3460. Further, the narrow scope of the Corps' stated grounds for disqualification—which identified specific, limited references in the size protest and Plaintiff's draft complaint that appeared to be based on the protected information, *see* AR 3460–64—suggests not that the Corps was retaliating against the threatened legal action but instead that it took issue with Plaintiff's use and retention of the protected information. And of course, the other substantial factors leading to the disqualification decision, like the Corps' concern that Plaintiff had manufactured evidence to justify its continued use of the information, are completely unrelated to Plaintiff's protests. *See* AR 3464, 3485.

Nowhere does the record indicate to the Court that the Corps would not have disqualified Plaintiff if it had retained, disseminated, and then used the protected information in some context other than a legal action. Instead, what is abundantly clear from the record is the Corps' concern that Plaintiff might gain an unfair advantage from having access to MVP's proprietary information and that Plaintiff's conduct following receipt of the inadvertently disclosed information had created an appearance of impropriety. *See, e.g.*, AR 3461 ("Marathon's size protest is based, in relevant part, on information it improperly attained and, contrary to the [S]olicitation's stated requirements . . . without notifying [the Corps] that it had received a competitor's clearly marked, protected source selection information."); *id.* (noting Plaintiff sought to "establish a legal foundation" for Plaintiff's "continued retention and use of MVP's proprietary and sensitive competitive data" and pointing to the fact that numerous people had received and retained

28

information).  It is worth noting that, had Plaintiff not improperly retained, disseminated, and used the protected information, it still could have pursued its right to initiate legal action following its loss of the contract.  For example, the procedures governing protests in this Court permit a protestor's attorney (but not the protestor) to access and use documents containing sensitive information to litigate a protestor's case, subject to a protective order.  But instead of ensuring that it complied with its obligations under the FAR to limit the improper use and dissemination of proprietary competitive information, *see* FAR 3.104-4, Plaintiff reviewed the protected information, disseminated it to several employees and other individuals outside the company, and retained the information for the company's use.  AR 3455–64.  That was the substantial, motivating factor for the Corps' actions, not Plaintiff's choice to avail itself of legal process.  *See* AR 3485.

Plaintiff fails to show that such conduct, as the moving factor for disqualification, was protected by the First Amendment.  It cites no authority holding the same.  *See* ECF No. 41 at 27; ECF No. 52 at 19.  In fact, federal courts have, as a general matter, recognized that the First Amendment does not confer upon an individual or entity a generalized right to violate other laws. *See, e.g.*, *Fla. Star v. B.J.F.*, 491 U.S. 524, 533–34 (1989) (recognizing a "clash[] between First Amendment" and other rights that counsels in favor of establishing "limited principles that sweep no more broadly than the appropriate context of the instant case," including, in the context of sensitive information, permitting the Government to "classify certain information" and "establish and enforce procedures ensuring its redacted release"); *cf. Taylor v. McDonough*, 71 F.4th 909, 935 (Fed. Cir. 2023) (asking, in determining whether government interference had violated a veteran's First Amendment right to access agency adjudication, whether the interference had caused the veteran "not to file a claim," and determining that the interference was illegal in part because the veteran had declined to pursue legal action).  Plaintiff does not have a First

Amendment right not to comply with regulations governing the use of source selection sensitive information. Its attempt to use and retain that information was not protected activity.

<div align="center">*    *    *</div>

The Corps' disqualification of Plaintiff from further participation in the TMIT procurement was neither substantively nor procedurally improper. Nor did the Corps violate Plaintiff's constitutional rights by disqualifying it from consideration. Accordingly, because Plaintiff no longer has a "direct economic interest" in the Solicitation, it does not have standing to pursue this bid protest. *Rex Serv. Corp.*, 448 F.3d at 1307; *see Tinton Falls Lodging*, 800 F.3d at 1360.

### B. The Marine Corps' Evaluation of Proposals Was Not Arbitrary and Capricious, Contrary to Law, or an Abuse of Discretion.

Even assuming Plaintiff had standing to pursue this bid protest, its remaining claims independently fail on the merits. Plaintiff challenges numerous aspects of the Corps' evaluation. It argues that (1) the Corps failed to timely and adequately address MVP's purported OCIs, ECF No. 41 at 34–37; (2) the Corps' evaluation of Plaintiff's past performance was arbitrary and capricious and contrary to law, *id.* at 37–38; (3) the Corps' Price evaluation was arbitrary and capricious, *id.* at 38–39; (4) the TET's evaluation of each offeror's strengths and weaknesses was arbitrary and capricious, *id.* at 39–43; (5) the Corps' CO acted in an arbitrary and capricious manner by failing to review MVP's compliance with the FAR's limitation-on-subcontracting clause, *id.* at 43–44; and (6) the CO abused her discretion by failing to seek a size determination for MVP to ensure its compliance with the FAR's small-business requirement, *id.* at 44–45. The Court takes each of Plaintiff's claims in turn.

1.    The Corps Reasonably Rejected Plaintiff's Allegations About MVP's Purported Conflicts of Interest.

Plaintiff's first evaluation challenge concerns its belief—which Dr. Brooks articulated to the Marine Corps in Plaintiff's debriefing questions and accompanying declaration, *see* AR 3275–85—that MVP's relationship with its subcontractor, Corps Solutions, created two impermissible conflicts of interest: (1) an unfair competitive advantage OCI and (2) an impaired objectivity OCI due to Corps Solutions' ability, as a range support contractor at each TMIT site, to assess its own performance on the new contract, *see* ECF No. 52 at 23.  Plaintiff argues that the CO had a duty under the FAR to assess such conflicts early in the procurement, that the CO failed to follow proper procedure, and that her later analysis of the conflicts of interest was inadequate.  *See* ECF No. 41 at 34–37 (citing FAR 9.504(a)).

The FAR provides that, if "information concerning prospective contractors is necessary to identify and evaluate potential organizational conflicts of interest," a contracting officer "first should seek the information from within the Government or from other readily available sources." FAR 9.506(a).  "If the contracting officer decides that a particular acquisition involves a significant potential organizational conflict of interest," the FAR requires the CO to "submit for approval to the chief of the contracting office" a written analysis, a draft solicitation provision, and, if appropriate, a proposed contract clause.  FAR 9.506(b).  Under the rule, any involvement by the chief of the contracting office is "necessary *only '[i]f* the contracting officer decides that a particular acquisition involves a *significant* potential organizational conflict of interest.'" *Paradyme Mgmt., Inc. v. United States*, 167 Fed. Cl. 180, 190–91 (2023) (emphasis in original) (quoting FAR 9.506(b)).  "Thus, the contracting officer is not required to document in writing or submit for approval a plan to neutralize apparent or potential conflicts, which in her discretion and

judgment are deemed not to be significant." *PAI Corp. v. United States*, 614 F.3d 1347, 1353 (Fed. Cir. 2010). Considering the discretion contracting officers receive generally and the CO's judgment that any alleged OCI specific to Corps Solutions was not significant, the CO did not violate applicable procedures by not documenting alleged conflicts prior to award and by declining to submit a recommendation to the chief of the contracting office. Given her judgment that any alleged conflict was not significant, the CO was not required to document anything.

Moreover, the CO's rejection of Plaintiff's substantive conflict-of-interest arguments was reasonable. Plaintiff's allegation that MVP secretively colluded with Corps Solutions to prepare a proposal in March 2024 using Corps Solutions' access to nonpublic, competitively useful information was entirely speculative. *See* AR 3451; *see also* AR 3277–82 (basing allegation solely on the overlap in timing between Corps Solutions' position as a TMIT supporting contractor and MVP's selection of Corps Solutions as its proposed subcontractor). As the CO pointed out, the mere timing of any teaming arrangement between MVP and Corps Solutions would also, under Plaintiff's logic, support the conclusion that Plaintiff too had improperly received access to nonpublic, competitively useful information from Corps Solutions, who was serving as a contractor at TMIT sites while Plaintiff was the incumbent TMIT services provider. *See* AR 3451. Even though Corps Solutions performed as a contractor at the locations where Plaintiff provided its TMIT services, Plaintiff provided no affirmative evidence that Corps Solutions had access to or shared with MVP any of Plaintiff's proprietary information. It argued only that it "defies logic" that MVP would have received no help from Corps Solutions in writing its proposal. AR 3282. The CO rightly dismissed such concerns as "suspicion and innuendo." AR 3452.

Further, although the CO found Plaintiff's claim of an impaired objectivity OCI to be "marginally valid," because it might appear improper for Corps Solutions, in its range support

capacity, to assess its own performance on the new TMIT contract, she concluded that the potential for impropriety was not significant and easily mitigatable by the Government performing the inspections of Corps Solutions' work. AR 3452. That conclusion was rational, well explained, and coherent. *See Impresa*, 238 F.3d at 1332–33. Accordingly, Plaintiff fails to show that any alleged OCIs for MVP justify permanent injunctive relief.

      2.    <u>The Corps' Evaluation of Past Performance Was Not Arbitrary and Capricious.</u>

      Plaintiff's next evaluation challenge concerns the Corps' assessment of its past performance on similar contracts. Plaintiff argues that the SSA acted irrationally and contrary to law by stating that Plaintiff's Satisfactory rating "could not be credited more favorably than [MVP's] neutral rating." ECF No. 40 ¶ 91; *see also* ECF No. 41 at 37. Plaintiff further argues that a July 14, 2024, contract performance report in which it received [ . . . ] ratings across all metrics should have been considered in the Corps' final Past Performance evaluation, which it completed on October 1, 2024. *See* ECF No. 41 at 37–38; AR 2650.

      To start, Plaintiff's characterization of the SSA's tradeoff analysis contravenes the evidence in the record. Specifically, the SSA never indicated that it could not credit a Satisfactory rating more than a Neutral rating—instead, the SSA determined that both offerors were "awardable and neither distinguished themselves in this factor." AR 2845. The SSA found "no basis to discriminate between [the offerors] because MVP Robotics may not be evaluated favorably or unfavorably, and [Plaintiff had] a reasonable expectation of successful performance." *Id.* "Thus," the SSA continued, "I do not find this to be a distinguishing factor for award." *Id.* As Plaintiff's own case citation confirms, an agency has discretion to make determinations exactly like this one. *See Bahrain Mar. & Mercantile Int'l BSC (C) v. United States*, 118 Fed. Cl. 462, 480 n.13 (2014) (noting that "[w]hile an agency may not assign an unfavorable rating to an offeror based on its

lack of a past performance history, it is entitled," but not required, "to treat a high past performance rating" as "worth more than a Neutral past performance rating"). The SSA exercised his judgment to determine that Plaintiff's past performance history did not distinguish it over MVP's past performance. *See* AR 2845. The Court will not substitute its judgment for the reasonable judgment of the Corps.[7] *See DynCorp*, 10 F.4th at 1311.

Additionally, Plaintiff fails to show that it was prejudiced by the Corps not considering Plaintiff's July 2024 performance report. Plaintiff argues that the information, which reflected numerous [ . . . ] ratings, was "too close at hand" for the Corps to ignore. ECF No. 41 at 37–38 (capitalization omitted) (citing *DKW Commc'ns, Inc.*, B-411182 et al., 2015 CPD ¶ 178 (Comp. Gen. June 9, 2015)). As MVP argues, Plaintiff does not explain how the Corps' failure to evaluate the July 2024 report—assuming the Corps should have known to consider the report, which the Court does not decide here—prejudiced it. *See* 5 U.S.C. § 706; *WellPoint*, 953 F.3d at 1377. Plaintiff merely asserts that its "advantage" would have been "strengthened." ECF No. 52 at 25;

---

[7] On July 23, 2025, Plaintiff filed a Notice of Additional Authority (ECF No. 60) pointing the Court to a recent opinion reviewing the Navy's determination that the Past Performance factor in the solicitation at issue "was not a discriminator when determining best value." *Advanced Tech. Sys. Co. v. United States*, 177 Fed. Cl. 443 (2025). Applying the analysis in *Advanced Technology Systems* to this case does not change the Court's conclusion. There, the record contained a conclusory statement by the decision-maker, without any further explanation, about the weight or value assigned to the factor (*i.e.*, whether the decision-maker would actually treat the ratings as equal or not). *See id.* at 455–56. Here, in contrast, the SSA affirmatively found, upon reviewing the PPET report, "no basis to discriminate between" the offerors, meaning the factor would not be a "distinguishing factor for award." AR 2845. Further, the conclusion that there was no basis to distinguish between the ratings is supported by the SSA's (and PPET's) explanation that, although MVP did not satisfy the requirements for a positive Past Performance rating, its subcontractor's performance on recent relevant efforts received "Exceptional" and "Very Good" performance ratings. *See* AR 2654, 2845. Declining to discriminate between Plaintiff and MVP was rational, considering the explanation that both the SSA and the PPET provided, especially in light of the SSA's determination that the Technical rating would be the distinguishing factor in this procurement. *See* AR 2845. Plaintiff's reliance on *Advanced Technology Systems* thus fails.

ECF No. 40 ¶ 201.  Plaintiff argues that the [ . . . ] evaluation would have "compelled a high expectation that [Plaintiff] would successfully perform" and therefore "warrants a finding of 'substantial confidence' rather than 'satisfactory confidence.'"  ECF No. 40 ¶¶ 198–99.  Plaintiff fails, however, to cite any portion of the Solicitation that supposedly required the Corps to consider a "[ . . . ] evaluation as equating to a "high expectation" of success thus requiring the Corps to issue a finding of "Substantial Confidence" on such basis.  To the contrary, the Solicitation stated that the Corps would "consider the character and quality of the offeror's performance on prior efforts in order to determine a single Past Performance Confidence rating."  AR 1603.  Plaintiff's failure to support its explanation is fatal to the claim, considering that Plaintiff previously submitted performance reports that showed a similar degree of performance quality.  *See* AR 2657–59 (noting performance reports with ratings from [ . . . ]).  Ultimately, Plaintiff received the second-highest Past Performance rating, "Satisfactory Confidence"; it does not establish a substantial chance that it would have received a higher rating had the Corps considered the [ . . . ] ratings from the July 2024 report.  *See* AR 2657–59; *see also* FAR 42.1503(b)(4) (listing [ . . . ] rating on the applicable five-point rating scale).

3.    The Corps' Price Evaluation Was Not Arbitrary and Capricious.

Plaintiff next challenges the Corps' determination that Plaintiff's pricing proposal presented some risk to the Corps, which the Corps used to support its determination that MVP's Technical proposal was worth the $25.9 million price premium (about 13.6 percent above Plaintiff's proposed price).  *See* ECF No. 41 at 38–39; AR 2681, 2846.  As with its other challenges, Plaintiff faces a steep burden to show that the Corps' Price evaluation was not reasonable, rational, or supported by the record.  *See Impresa*, 238 F.3d at 1332–33.  It fails to meet that burden.

35

The FAR gives agencies significant discretion to consider a wide variety of datapoints related to offerors' proposed prices, in addition to the significant discretion agencies receive to balance varying non-price elements in a best-value procurement. *See* FAR 15.404-1(g)(1); *Eagle Hill Consulting, LLC v. United States*, 171 Fed. Cl. 115, 140 (2024) ("In a best value procurement, agencies have even greater discretion to determine the proper award than if the contract was awarded upon the basis of cost alone." (citing *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004))).

The SSA's determination that Plaintiff's Price proposal presented some risk, and that such risk tended to support the conclusion that MVP's proposal represented the best value to the Government, was well within the SSA's considerable discretion and was amply supported by the record. The SSA and Cost/Price Evaluation Team ("C/PET") accurately described the difference in Plaintiff's proposed per-trailer price for the 32-hour trailers as compared to the 64-hour trailers. *See* AR 2680, 2846. Plaintiff does not dispute the Corps' factual findings, arguing only that it was unreasonable for the Corps to determine that such a distinction presented a risk that Plaintiff may not perform successfully on its obligations should the Corps purchase 32-hour trailers. *See* ECF No. 41 at 38.

Plaintiff argues that performing the 32-hour trailer option at a loss was "not what [Plaintiff] proposed." *Id.* The Corps, however, assessed the explanation Plaintiff gave for its pricing proposal and found Plaintiff's rationale to be unsupported. *See* AR 2694–95. Specifically, the Corps was concerned about the potential that Plaintiff's proposal would create a performance risk if, contrary to Plaintiff's prediction (*see* AR 2315), the Corps ordered 32-hour trailers. AR 2846. The Corps was well within its discretion to set out that concern, based on its own perceived needs (not Plaintiff's prognostication), as a distinguishing basis for determining that MVP's proposal

36

represented the best value to the Government—even if the balanced-pricing concern did not create sufficiently acute risks warranting elimination of Plaintiff's proposal on that basis alone. This Court will not question the Corps' reasonable judgment, especially when such judgment concerns a best-value tradeoff decision. *See DynCorp*, 10 F.4th at 1311; *Eagle Hill Consulting*, 171 Fed. Cl. at 140.

4.    The Corps Rationally Assessed Each Offeror's Strengths and Weaknesses.

Plaintiff next raises an array of challenges to the Corps' assignment of certain Technical strengths in MVP's proposal and weaknesses in Plaintiff's proposal. ECF No. 41 at 39–43. As Plaintiff argues, technical evaluations must have adequate support in the record and may be set aside as arbitrary and capricious when resulting from the unequal treatment of offerors. *Id.* at 39 (citing *Golden IT, LLC v. United States*, 165 Fed. Cl. 676, 687 (2023)). Such claims succeed only when the agency "used a significantly different basis in evaluating the proposals than was disclosed," *Banknote Corp. of Am., Inc. v. United States (Banknote II)*, 56 Fed. Cl. 377, 387 (2003), or when two offerors' proposals were "'substantively indistinguishable' or nearly identical" yet received different ratings, *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372–73 (Fed. Cir. 2020) (citing *Enhanced Veterans Sols., Inc. v. United States*, 131 Fed. Cl. 565, 588 (2017)). Plaintiff fails to show that the TET's assessments were unreasonable under such standard. As MVP correctly argues, Plaintiff's challenges represent "mere disagreement" with the results of the Corps' Technical evaluation that are insufficient for this Court to disturb the Corps' conclusions. ECF No. 31 at 31 (citing *Crowley Gov't Servs., Inc. v. United States*, 158 Fed. Cl. 358, 373 (2022)).

a.  *MVP's Strengths Under the Technical Evaluation*

Plaintiff first objects to the TET recognizing that MVP's subcontractor received various external awards for human resources management, thus tending to give MVP's proposal a relevant

strength under its Staffing Plan Narrative. *See* ECF No. 41 at 39–40; AR 2670. Plaintiff asserts that such recognitions—which it characterizes as "'pay-to-play' marketing gimmicks"—cannot be used as a rational basis for a contract award decision. ECF No. 41 at 39–40. Plaintiff provides no authority for that assertion, and it fails to explain how the existence of an application fee—the sole piece of evidence it provides for the assertion that such recognitions are gimmicks, *see* ECF No. 40 ¶¶ 159–60—proves that such awards are meaningless. The existence of a fee alone does not support Plaintiff's argument that such awards are necessarily irrelevant to procurement decisions. Further, Plaintiff asserts that it should have received similar credit for its 91-percent employee retention rate, but it fails to explain how its internal retention statistics are substantively indistinguishable from external human resources awards. *See* ECF No. 41 at 39–40. That those datapoints are based on different sources and may measure different positive attributes of each company provides enough dissimilarity to give the Corps a clear basis to assess Plaintiff's and MVP's Staffing Plans differently. *See Off. Design Grp.*, 951 F.3d at 1372–73.

Plaintiff next challenges a phase-in plan strength that the Corps assigned to MVP's Technical proposal based, in part, on MVP's plan to have its equipment delivered to sites [ . . . ] prior to the contract start date. *See* ECF No. 41 at 40; AR 2671. Plaintiff believes it should have received a strength too because, as the incumbent, its equipment would already be in place. *See* ECF No. 41 at 40. But the Corps did give Plaintiff credit for having equipment in place. *See* AR 2666 ("The government acknowledges the benefit of the offeror 'currently [having] the required number of staff, TMITs, . . . and ancillary equipment . . . at all of the locations to fulfill the quantities expected . . . .'" (alteration in original) (quoting AR 2494)). The Corps simply determined that other deficiencies in Plaintiff's phase-in proposal outweighed any benefit from

Plaintiff's on-site equipment.  *See id.*  Plaintiff thus fails to show that the Corps evaluated MVP's phase-in strength unreasonably.

Plaintiff also challenges two strengths that MVP received for operational availability and [ . . . ] strategy.  ECF No. 41 at 40–41.  Plaintiff argues that it provided an "extremely detailed" proposal that "analyzed each type of potential failure that could result in unexpected downtime," while MVP "did not address [unexpected] downtime at all."  *Id.* at 41.  It ignores, however, that the Corps perceived an advantage from MVP's proposal to maintain [ . . . ] operational availability, minimizing both planned and unexpected unavailability, by regularly rotating out its TMITs for preventative maintenance [ . . . ].  *See* AR 2671.  Plaintiff fails to explain how its discussion of avoiding unexpected downtime was substantively indistinguishable from MVP's maintenance proposal.  *See id.*; *Off. Design Grp.*, 951 F.3d at 1372–73.  Similarly, Plaintiff complains that it was not assessed a strength for its replacement plan, including daily post-training inspections and repairs of TMITs as well as twice-a-year servicing.  *See* ECF No. 41 at 41–42.  But, again, Plaintiff provides no explanation for how its discussion of its preventive maintenance strategy was substantively indistinguishable from MVP's plan to [ . . . ] all its fielded TMITs with [ . . . ] by the end of the [ . . . ] contract year (*see* AR 2671, 2694).  On its face, MVP's [ . . . ] was pitched as being above and beyond the type of "routine maintenance and consumables replacement" that Plaintiff proposed.  AR 2671.  Accordingly, the Corps reasonably assigned MVP these two strengths.

Finally, Plaintiff challenges the Corps' assignment of a strength to MVP for the ability of its TMITs to avoid obstacles only [ . . . ] inches tall without human intervention.  *See* ECF No. 41 at 42; AR 2672.  This challenge is wholly meritless.  Plaintiff claims the strength given to MVP's proposal is arbitrary because Plaintiff's own TMITs are able to avoid obstacles that are 20 inches

tall, which was comfortably within the Solicitation's requirement that TMITs avoid obstacles taller than 24 inches. *See* ECF No. 41 at 42; AR 753, 2667, 2672. Far from being arbitrary, the Corps made the rational determination that MVP's better proposal provided a significant enough benefit to merit the formal award of a strength. *See* AR 2672. If under the Solicitation it was good for a TMIT to avoid short obstacles, a logical extrapolation would be that it is better to avoid even shorter obstacles. *See* AR 753 (establishing that avoiding obstacles taller than 16 inches was an "objective" as compared to the 24-inch tall "threshold" requirement). Awarding such a strength was expressly consistent with the Solicitation and a quintessential judgment call with which the Court will not interfere. *See DynCorp*, 10 F.4th at 1311.

       *b. Plaintiff's Weaknesses Under the Technical Evaluation*

In challenging the weaknesses that the Corps assigned to its proposal, Plaintiff first argues that the Corps improperly penalized Plaintiff for failing to provide a detailed description of the processes it would use to meet all staffing requirements identified in the Solicitation, including the requirements established in the sub-elements identified under the Solicitation's Technical Approach Evaluation Criteria. *See* ECF No. 41 at 42; AR 1599–1600, 2663–64. Plaintiff argues that the Corps' assessment of a weakness for such failure applied an unstated evaluation criterion. *See* ECF No. 41 at 42. As MVP points out, ECF No. 49 at 30–31, the relevant sub-element (sub-element 2, identified on Plaintiff's TET evaluation report, *see* AR 2663) appears in Section M of the Solicitation. It expressly states that "the Government will evaluate . . . 2. How well offerors' narratives prove that their choice of staffing resources will enable the offeror to perform all PWS [Performance Work Statement] requirements." AR 1600. The Corps acted within its substantial discretion by evaluating Plaintiff according to the criteria the TET outlined in its report, which,

contrary to Plaintiff's argument, were not unstated and explicitly appeared in the Solicitation. *See Banknote I*, 365 F.3d at 1355–57.

Plaintiff similarly fails in its second challenge to its assessed weaknesses, this one focused on Plaintiff's failure to demonstrate an understanding of the Solicitation's requirements related to the Risk Management Framework; Safety Assessment Report; and Programmatic Environmental, Safety and Occupational Evaluation. *See* ECF No. 41 at 43–44; AR 1047–48, 1064, 2666. Plaintiff does not dispute that its proposal lacked descriptions of the labor categories assigned to complete those tasks, arguing only that Section L of the Solicitation did not put it on notice that it was required to submit such descriptions. *See* ECF No. 41 at 43. The Government and MVP respond that the requirements are clearly laid out in the PWS. *See* ECF No. 49 at 31; ECF No. 50 at 38–39. As above, Plaintiff is incorrect: the PWS identified each requirement, and Section L of the Solicitation explicitly notified offerors that the Corps was "seeking an offeror with the capability to provide the services described in the [TMIT] Base Contract Performance Work Statement." AR 1587; *see also* AR 1047–48, 1064. The Corps did not act in an arbitrary and capricious manner by assigning Plaintiff a weakness for failing to provide supporting descriptions of its ability to satisfy requirements laid out in the PWS. *See Banknote I*, 365 F.3d at 1357.

Plaintiff's final challenge to an assessed weakness concerns the Corps' determination that Plaintiff failed to explain how the over-the-air updates it proposed would be performed on its TMITs and, further, to explain how it would improve security controls to govern those wireless updates. *See* ECF No. 41 at 43; AR 2666. Plaintiff argues that, because the Solicitation did not require offerors to provide over-the-air updates, it cannot be downgraded for inadequately explaining its proposal to perform them. *See* ECF No. 41 at 43. But the Corps, in its judgment, believed that Plaintiff's proposal did not present the unmitigated benefits that Plaintiff perceived.

41

AR 2666.  Indeed, it appears the Corps determined that over-the-air updates actually presented a

security risk or, at a minimum, would require Plaintiff and the Corps to expend additional resources

to mitigate potential security concerns.  *See id.*  Such a conclusion is not irrational.  *See Impresa*,

238 F.3d at 1332–33; *DynCorp*, 10 F.4th at 1316 (noting the requirement that agencies consider

"important aspect[s] of the problem[s]" facing them (quotation omitted)).

    5.    <u>MVP's Proposal Complied with the FAR's Limitation on Subcontracting.</u>

    Plaintiff next argues that the Corps acted improperly by failing to determine whether

MVP's proposal complied with the FAR's limitation on subcontracting, which appears in FAR

52.219-14.[8]  *See* ECF No. 41 at 43–44.  The FAR mandates that, for a services contract, the

Government will not pay more than 50 percent of the total amount paid for contract performance

to subcontractors "that are not similarly situated entities," which in this small-business set-aside

contract would be a subcontractor that is not also a small business under the same size standard

assigned to the contract.  FAR 52.219-14(b), (e)(1).  "When reviewing compliance with the

limitation on subcontracting clause at the time of contract award, the court considers whether 'a

proposal, on its face, should lead an agency to the conclusion that an offeror could not and would

not comply with the subcontracting limitation.'"  *Precision Standard, Inc. v. United States*, 228 F.

App'x 980, 982 (Fed. Cir. 2007) (quoting *Chapman L. Firm v. United States*, 63 Fed. Cl. 519, 527

(2005), *aff'd*, 163 F. App'x 889 (Fed. Cir. 2006)).

---

[8] Plaintiff urges the Court to disregard the CO's post-hoc memorandum, dated February 4, 2025, which found no reason to believe that MVP would fail to comply with the FAR's limitation on subcontracting.  *See* ECF No. 41 at 43; AR 3734.  As explained *infra*, MVP's proposal facially complied with the FAR's subcontracting requirements.  Thus, the Corps' memorandum is irrelevant to the Court's decision here.

Nothing about MVP's proposal suggested, on its face, that MVP would not comply with the FAR's limitation on subcontracting. The Solicitation expressly included the FAR's limitation on subcontracting provision, and MVP affirmatively agreed with all terms, conditions, and provisions included in the Solicitation. AR 1556, 1792.[9] Moreover, Plaintiff points to no evidence in the record that would make it obvious, from the face of MVP's offer, that MVP would be subcontracting more than 50 percent of the total amount paid for contract performance to Corps Solutions. The only evidence Plaintiff provides is that MVP proposed using Corps Solutions to perform "[ . . . ] of the on-site services that are the primary and vital requirements of this contract." ECF No. 41 at 44. Plaintiff, however, does not tie that assertion to the *value* of the services that both Corps Solutions and MVP would provide.

Even assuming that MVP proposed that Corps Solutions would provide [ . . . ] of the labor for each site (a fact that is not immediately apparent from reviewing MVP's Price proposal, *see* AR 2621–49), as a general matter, proposed materials costs for each location in each ordering period were significantly higher than labor costs, *see, e.g.*, AR 2638 (showing, for the Camp Lejeune location, a monthly cost to the Corps of $[ . . . ] million for direct labor and $[ . . . ] million for materials for seven trailers at 64 hours in the first ordering period), 2640 (showing, for Camp Pendleton, a direct labor cost of $[ . . . ] million and $[ . . . ] million for materials in the same period). Far from providing facially obvious evidence that MVP would fail to comply with the FAR's subcontracting limitation, the record appears to confirm that MVP would comply. In the absence of clear evidence indicating otherwise, the Court declines to find that the Corps' acted

---

[9] The Solicitation contained a deviated version of the FAR's standard limitation on subcontracting clause: FAR 52.219-14, Limitation on Subcontracting (DEVIATION 2021-O0008), available at https://www.acq.osd.mil/dpap/policy/policyvault/USA000277-23-DPC.pdf.

43

unreasonably by relying on MVP's certification of compliance with the FAR's requirements. *See Precision Standard*, 228 F. App'x at 983 (affirming a CO's assumption that an offeror would comply with the contract provisions); *Chapman L. Firm*, 63 Fed. Cl. at 528.

Plaintiff's focus on [ . . . ], referred to as the contract manufacturer of MVP's TMITs, cannot save its claim. Plaintiff argues that MVP's proposal is noncompliant because MVP is, in effect, subcontracting [ . . . ] of TMITs to [ . . . ]. Its claim stumbles in two ways. First, MVP's proposal did not indicate that [ . . . ] will act as a subcontractor on the contract. *See* AR 1751 ("We [ . . . ] the required TMITs at [ . . . ], a contract manufacturer [ . . . ]."). The proposal did not indicate that MVP would be relying on [ . . . ] as a subcontractor to fulfill the requirements of this Solicitation.[10] And, second, as MVP rightly argues, Plaintiff has provided no evidence that [ . . . ] is not also a small business within the size standard required by the contract, in which case any theoretical subcontractor relationship would comply with the FAR's subcontracting limitations. *See* ECF No. 49 at 26–27; ECF No. 41 at 43–44. Because Plaintiff's burden is to show the Corps acted in an arbitrary and capricious manner, and because making that showing here requires showing the proposal, on its face, should have led the Corps to conclude that MVP would not

---

[10] In its Response and Reply, Plaintiff argues that [ . . . ] qualifies as a subcontractor under FAR 52.244-2(a). *See* ECF No. 52 at 27. As an initial matter, FAR 52.244-2(a) was not included in the Solicitation or the resulting contract and is therefore inapplicable to defining what constitutes a subcontract for present purposes. *See* AR 1555–71, 3020–36. Even assuming FAR 52.244-2(a) did apply, it defines "[s]ubcontract" to mean "any contract . . . entered into by a subcontractor to furnish supplies or services for performance of the prime contract or a subcontract." FAR 52.244-2(a). The very provision Plaintiff cites contains an important limitation: "*for performance of the prime contract or a subcontract*." *Id.* (emphasis added). MVP's proposal contains no indication that [ . . . ] is manufacturing MVP's TMITs "for performance of" the TMIT contract. The proposal, read plainly, seems to suggest [ . . . ] is a "contract manufacturer" for all TMITs that MVP produces. That would mean that MVP's contract with [ . . . ] for TMIT production is not limited in any way to the purposes of this Solicitation, and, thus, that [ . . . ] does not qualify as a subcontractor under the FAR. Thus, [ . . . ]'s role in manufacturing TMITs for MVP is wholly irrelevant to the limitation on subcontracting analysis for this services contract.

comply, a lack of evidence means that Plaintiff's claim must fail. *See Impresa*, 238 F.3d at 1333; *Precision Standard*, 228 F. App'x at 982–83.

6.    <u>The CO Did Not Abuse Her Discretion by Declining to Seek a Size Determination.</u>

Finally, Plaintiff challenges the CO's decision not to seek a size determination for MVP, largely rehashing its argument that, because of MVP's relationship with Corps Solutions, MVP does not and should not qualify as a small business for purposes of the Solicitation. *See* ECF No. 41 at 44–45. Even under the precedent Plaintiff cites as support, its claim fails.

"[A] contracting officer is generally entitled to rely on a contractor's certifications" that it will comply with applicable regulations. *Harmonia Holdings Grp., LLC v. United States*, 999 F.3d 1397, 1405–07 (Fed. Cir. 2021); *see Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1315 (Fed. Cir. 2016) ("[A]n agency may rely upon an offeror's certification of compliance with a solicitation's technical requirements."). "[T]o stake out a claim for relief," Plaintiff's burden "was not simply to show" that MVP's proposal "contained some suggestion of an ostensible subcontractor relationship, but instead that the indicia of such a relationship were so compelling that the contracting officer necessarily abused [her] discretion by failing to refer" MVP "to the SBA for a size status determination." *Harmonia*, 999 F.3d at 1407.

For many of the same reasons laid out above, Plaintiff fails to meet that highly demanding standard. Here, MVP's own employee will act as the program manager for this Solicitation. *See* AR 2626. The program manager "is responsible for the overall management of the TMIT program" and "for the oversight of all personnel." *Id.*; *see also Harmonia*, 999 F.3d at 1407 (noting that the contract's "proposal indicated that its own employee, not an employee of its subcontractor, would act as the project manager" which rendered the protester's "assertion that [the awardee] intended for its subcontractor to manage the project [as] no more than speculation").

45

Like in *Harmonia*, MVP submitted its own experience that it contended was relevant to the requirements of the Solicitation. *See* AR 1771–76; *Harmonia*, 999 F.3d at 1407. Indeed, the Corps later determined that experience to be, at a minimum, somewhat relevant. *See* AR 2651–52. Like in *Harmonia*, MVP's proposal gave no indication—let alone compelling indicia—that it would be unusually reliant on Corps Solutions' services in performing the requirements of the Solicitation. *See* 999 F.3d at 1406–07. Accordingly, Plaintiff cannot show that the CO abused her discretion by declining to refer MVP to the SBA for a size determination.

<div align="center">*    *    *</div>

Independent of its standing to challenge the award under the Solicitation, Plaintiff's many evaluation challenges fail on the merits. The Corps conducted a thorough, well-assessed procurement that complied with the FAR and that is entitled to the full range of deference afforded to agencies under APA review. Plaintiff fails to show that the Corps acted contrary to law, in an arbitrary and capricious manner, or otherwise abused its discretion.

## C.    Plaintiff Is Not Entitled to Injunctive Relief.

Plaintiff requests that the Court set aside the Corps' disqualification decision and permanently enjoin the TMIT contract award to MVP. *See* ECF No. 41 at 46. To obtain permanent injunctive relief, Plaintiff must show that (1) it succeeded on the merits of the case, (2) it will suffer irreparable harm if the Court withholds injunctive relief, (3) the balance of hardships favors an injunction, and (4) it is in the public interest to grant injunctive relief. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). Plaintiff's claims fail on the merits; accordingly, the Court need not assess the remaining factors. *Obsidian Sols. Grp., LLC v. United States*, 54 F.4th 1371, 1376 (Fed. Cir. 2022) ("There can be no injunctive relief without a corresponding prevailing claim."); *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 (Fed. Cir. 2018)

<div align="center">46</div>

(holding that "proving success on the merits is a necessary element for a permanent injunction");

*DevTech Sys., Inc. v. United States*, 176 Fed. Cl. 297, 339 (2025).  Because its protest does not succeed, Plaintiff is not entitled to injunctive relief.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 41) is **DENIED**.  The Government's Cross-Motion for Judgment on the Administrative Record (ECF No. 50) is **GRANTED**.  Defendant-Intervenor's Cross-Motion for Judgment on the Administrative Record (ECF No. 49) is **GRANTED** and its first Motion to Dismiss (ECF No. 31) is **DENIED AS MOOT**.  The Clerk is directed to enter judgment accordingly.

**SO ORDERED.**


Dated:  November 10, 2025                      */s/ Kathryn C. Davis*
                                              KATHRYN C. DAVIS
                                              Judge